David Stebbins (pro se Plaintiff)
123 W. Ridge Ave.,
APT D,
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                                  PLAINTIFF

VS.                                        Case 3:23-cv-00322-TLT

GOOGLE, LLC                                                  DEFENDANTS

## OPPOSITION TO MOTION TO DISMISS

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Opposition to the Defendant's Motion to Dismiss.

## I: TABLE OF CONTENTS

| Section | Page |
|---|---|
| I. Table of Contents | i |
| II. Table of Authorities | iii |
| III. Facts of the Case | 1 |
| IV. Argument | 2 |
| 1. Legal Threshold for Failure to State a Claim | 2 |
| 2. I'm just trying to silence criticism. | 2 |
| A) Can't be disposed of on the pleadings | 3 |
| 3. Fair Use | 4 |
| 4. Factor #1: Purpose & Character | 5 |
| A) Criticism | 5 |
| B) ATTA's true purpose | 8 |
| C) The sub-factors that weigh against fair use | 9 |
| D) Wrapping Up Factor #1 | 12 |

5.      Factor #2: Nature of Original       13

   A)     Inglewood and Political Speech       14

   B)     Portion copied vs. overall work       15

6.      Factor #3: Amount & Substantiality       16

7.      Factor #4: Effect on the Market       17

   A)     Defendant's Baseless Argument       17

   B)     Sub-Factors that Weigh Against Fair Use       19

   C)     Wrappng up Factor #4       21

8.      Wrapping Up Four Factors Test       21

9.      The case is not frivolous, so declaring me a       22
        vexatious litigant is inappropriate.

   A)     A pre-filing review is unnecessary because it is redundant.       24

   B)     Barring IFP status in the future is going too far.       24

   C)     The Pro Bono Office already provides a sufficient safeguard       24
        against patently frivolous filings.

V.      Conclusion       25

## II: TABLE OF AUTHORITIES

**Rules & Statutes**                                                **Page(s)**

- 28 USC § 1915                                                    2,7,25

- Fed.R.Evid. 201                                                  4

- Fed.R.Evid. 404                                                  8

- Leval, P. (1990). Toward a Fair Use Standard,                   10,11,12

  Harvard Law Review, 103(5), 1105. doi: 10.2307/1341457.

- Stim, R. (2021, November 25). Measuring Fair Use: The Four       16

  Factors. Stanford Copyright and Fair Use Center.

  https://fairuse.stanford.edu/overview/fair-use/four-factors/

**Case Law**                                                       **Page(s)**

- Bell Atlantic Corp. v. Twombly, 550 US 544 (2007)               2,3

- Campbell v. Acuff-Rose, 510 US 569 (1994)                       passim

- Castle Rock v. Carol Publishing, 150 F. 3d 132 (2nd 1998)       5,7

- De Fontbrune v. Wofsy, 39 F. 4th 1214 (9th Cir. 2022)           17

- Denton v. Hernandez, 504 US 25 (1992)                           2

- Dr. Seuss v. Comicmix, 983 F. 3d 443 (9th Cir. 2020)            passim

- Harper & Row v. Nation, 471 US 539 (1985)                       10,17

- Hosseinzadeh v. Klein, 276 F. Supp. 3d 34 (SD NY 2017)          15

- Hughes v. Benjamin, 437 F. Supp. 3d 382 (S.D. NY 2020)          passim

- Monge v. Maya Magazines, 688 F. 3d 1164 (9th Cir. 2012)         passim

- Neitzke v. Williams, 490 US 319 (1989)                          23

- Peterman v. Rep. Nat. Com., 320 F. Supp. 3d 1151 (MT 2018)      18

- Snyder v. Phelps, 562 US 443 (2011)                             14

- Sony v. Universal, 464 US 417 (1984)                            10,18

### III: FACTS OF THE CASE

1.      I am a YouTuber who goes by the alias "Acerthorn." On or around April 10, 2022, an unknown individual changed his alias on YouTube to be "Acerthorn the True Acerthorn," or ATTA for short. This channel was dedicated almost exclusively to harassing me, doxxing me, and infringing on my copyright.

2.      For his channel icon, ATTA used an image of my face, making a very smug facial expression. This image was taken from a video on my YouTube channel called "Acerthorn's Credibility as a Reviewer (w/ Montyspa on Co-Commentary)," a video whose copyright is registered under the registration number PA0002340792. Therefore, the icon constitutes prima facie copyright infringement. ATTA made a few additions to the face, the most significant change (although that's not saying much) is the inclusion of the two words "Acerthorn Laws." These words were partially cropped out.

3.      On August 4, 2022, I issued a DMCA Takedown Notice to Google LLC, asking them to remove the infringing icon, but they did not take the icon down.

4.      I filed a claim with the Copyright Claims Board (CCB), but Google chose to opt out of the CCB, causing that case to be dismissed without prejudice. I then proceeded to file the current lawsuit in this Court. Immediately after filing this lawsuit, on or around January 25, 2023, ATTA unceremoniously deleted his channel.

5.      The defendant filed a motion in a separate case (the Motion to Relate) seeking to have this case considered "related" to that one and thus overseen by the same judge. No relation was found.

6.      The Defense now moves to dismiss for failure to state a claim, arguing that the icon is clearly and obviously fair use, and that the words "Acerthorn Laws" are in fact criticism of my litigious past. They also move for me to be declared a vexatious litigant, and to be prohibited from ever obtaining in forma pauperis status in this Court ever again.

7.      A motion to strike was filed, seeking to have inadmissible and frivolous portions of the motion to dismiss stricken. The contents of that motion are hereby incorporated by reference.

## IV: ARGUMENT

1.      For the following reasons, the defendant's motion to dismiss should be denied.

### IV-1: Legal Threshold for Failure to State a Claim

2.      A complaint must not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." See Bell Atlantic Corp. v. Twombly, 550 US 544, 1959 (2007). "An in forma pauperis complaint may not be dismissed … simply because the court finds the plaintiff's allegations unlikely. Some improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that many allegations might be strange, but true; for truth is always strange, Stranger than fiction." See Denton v. Hernandez, 504 US 25, 33 (1992) (citations and quotations omitted). Furthermore, when reviewing the complaint for failure to state a claim, the Court "must accept as true all of the factual allegations contained in the complaint," except for those facts which the Court can take judicial notice of. See Twombly at 1975.

3.      That last part is especially important here, because ATTA – the direct infringer in this case – has deleted his channel since this lawsuit got filed. The link I provided in ¶ 11 of the Complaint no longer works. At the time when Magistrate Judge Cisneros reviewed the complaint under § 1915, she could have seen the channel and its infringing icon (along with the library of videos it had uploaded). She could have disagreed with many of my factual allegations in the complaint[1] without violating my due process rights, but chose not to. But now that this case has been reassigned to a district judge due to the defense declining to consent to magistrate judge jurisdiction, the new judge does not have that same luxury. The only things the new judge may consider to support the defendant's loudly insisted upon claims of fair use are the things that I openly admit to in the text of my own complaint.

### IV-2: Defendants claim that I'm just trying to silence criticism.

4.      In their motion to dismiss, the defendants continue their sister & parent companies'

---

1   Including, but not limited to, my allegations that the additions to the channel icon amount to nothing more than "a mish-mash of nebulous 'stuff' simply slapped onto my face," as well as my allegations that the majority of the channel's videos were mere verbatim reuploads of clips or whole videos with no alterations or modifications whatsoever, let alone transformative changes.

previous pattern of baseless accusations against me, by claiming that I am filing this lawsuit *solely* out of an attempt to silence criticism about me. Despite me explaining, many many times, that this is a false accusation, and despite the complete lack of any/all evidence to support the accusation, the defense continues to raise it, time and time again. They raised it in the Polano case when they frivolously attempted to have that case related to this one, and now they are raising it again.

5.      The Defendant is not saying that I'm silencing criticism in the process of protecting my valid legal rights, nor are they accusing me of seeking to silence criticism as well as protect my copyright and/or stop harassment. They are accusing me of acting with the sole, exclusive motive of silencing criticism, and absolutely nothing else. Silencing criticism is not simply 0.1% or 99.9% of my agenda, but literally 100% of it. All the harassment, all of the doxxing, and all of the copyright infringement that isn't fair use, would all be water under the bridge, from my point of view, as long as the criticism (and ONLY the criticism) was not part of it.

6.      In all instances, the defense fails to provide even so much as a scintilla of evidence to support these  outlandish claims. In every instance, they simply make the accusation and leave it at that.  They don't even *try* to back up their claims with anything remotely resembling proof.

7.      I have already filed a Motion for Sanctions in the Polano case to try to silence these frivolous accusations. I have also filed a Motion for Protective Order in this case, although its hearing date has been pushed back to June for some reason, giving the defense the opportunity to swoop in and make this frivolous accusation against me once more.

8.      Just for this alone, the Defendant's motion to deserves to be stricken.

        IV-2-A: The accusation that I am simply attempting to silence  criticism cannot be disposed of on a motion to dismiss.

9.      This accusation is 100% false, and is made in bad faith. However, for the purposes of this motion, I should not even have to address these accusations in-depth. The reason for this is simple: On a motion to dismiss, the Court cannot look beyond the scope of the Complaint, things which are directly incorporated into the Complaint, or things which are properly subject to judicial notice. See Twombly.

10.     Things that are publicly viewable on the Internet, however, are NOT subject to judicial notice. To be judicially noticeable, a fact has to come from a source whose accuracy cannot reasonably be questioned. See FRE 201(b)(2). It is common knowledge that rumors and accusations spread on the Internet (and especially on social media) are inherently unreliable, inherently biased, and very easy to fabricate.

11.     Therefore, even if the Court *wanted* to make the finding that my sole motive with bringing this suit was to silence criticism about me, it cannot do so at this stage unless …

    (a)     I have admitted, somewhere on public record in court, that my sole motive for filing this lawsuit is to silence criticism about me, or

    (b)     It is readily apparent, from the face of the Complaint, that I could not possibly have filed this lawsuit for literally any reason whatsoever other than to silence criticism.

12.     Since neither of these circumstances are present, that means the Court cannot adjudge me guilty of having this motive, and not having any other motive besides just this one (which is just as essential as having the bad motive in the first place), until after discovery. The defense will have to actually share its evidence with me, I will get the chance to review that evidence, cross examine the defense witnesses, and I will be entitled to collect and present evidence to rebut their claims (as well as be afforded a reasonable amount of time[2] to go and get the evidence I need). "Due process of law" is a fundamental part of our legal system, designed to ensure fairness and to ensure that parties just like Google are unable to have me subject to judicial sanctions and public humiliation just by making blatantly false accusations against me that they can never hope to prove. But that absolutely cannot be disposed of on a motion to dismiss.

### IV-3: Fair Use

13.     The defendant's entire case for dismissal on the pleadings is exclusively grounded in their insistence that the allegedly infringing icon is fair use. While it is theoretically possible for a copyright infringement suit to be dismissed at the pleading stage for failure to state a claim on the grounds that the alleged infringement is fair use, such a feat is exceptionally rare, and is usually only reserved for the most clear-cut cases of fair use. In Hughes v. Benjamin, 437 F.

---

2   While there is no bright line rule as to how much time counts as "reasonable," consider the fact that  discovery in civil litigation usually lasts about six months, compared to the mere two weeks I have to respond to this Motion.

Supp. 3d 382 (S.D. NY 2020), for example, the court found fair use at the pleading stage because it made a decisive finding that *all four factors* weighed in favor of fair use. See id at 390-394. Furthermore, the court was only able to make the findings it did because a lot of the factors that normally require the defendant to show proof were actually common knowledge (such as the heavily polarized state of modern American political discourse; see id at 394), which gave the court the ability to make findings of fact that otherwise would have been egregiously inappropriate to make at the pleading stage.

14.     The instant case is not nearly as cut and dry as the one in Huges v. Benjamin. To help demonstrate this, I proffer **Exhibit A** for the Court's consideration. This is a "fair use checklist" which comes from the University of California, so I assume it must take all 9th Circuit case law into consideration. This checklist sets forth, not just the four factors, but also numerous sub-factors within each factor. I'll refer to this checklist on multiple occasions throughout this brief.

### IV-4: Factor #1: Purpose & Character

15.     The first factor – "purpose and character of the use" – asks whether the work is considered "transformative," as well as whether the use is for commercial gain/profit. However, other sub-factors to consider include, but are not limited to, whether the allegedly infringing use is for entertainment purposes, and whether the infringer acted in good faith.

16.     It is also important to keep in mind that, when analyzing whether the secondary use is transformative, this is not a wholly binary determination. It's not a question of whether or not the secondary use is transformative; it's a question of *to what extent* it is transformative. Many secondary works have failed the first factor (without even going into the other three factors) because they were found to be "minimally transformative." See Monge v. Maya Magazines, 688 F. 3d 1164 (9th Cir. 2012) and Castle Rock Entertainment v. Carol Publishing Group, 150 F. 3d 132 (2nd 1998)[3], just to name a few.

### IV-4-A: Criticism

17.     The Defendant insists that the inclusion of the words "Acerthorn Laws" over my face constitute criticism of my litigious past from many, many years ago. However, to call this

---

3   Both of which repeatedly, throughout the opinions, refer to how the secondary uses are "minimally transformative" as a primary reason for why fair use was wanting.

"criticism" is, at best, a stretch. In reality, it is nothing more than Defendant making a strained attempt to interpret transformative value where none exists.

18.     All these two words can possibly convey to people is that "Acerthorn" is affiliated with "law" in some unspecified capacity. This is not transformative. You could slap the word "laws" onto nearly anyone's likeness and instantly claim fair use if that were the case. To show you what I mean, please find attached **Exhibit B**, a compilation of four "memes" (if you could even call them that) that take four well-known personas – 3 real-life people and one fictional character – and add their names, followed by the word "laws," over their likenesses. All four of these people are affiliated with law or politics in one capacity or another.

19.     However, these memes still tell us *absolutely nothing* about these people! If you didn't already know who these people were and what they were famous for, these memes wouldn't tell you anything new. Even when you know who these people are, and why their names are affiliated with law and politics, these memes still don't actually say anything specific about them, e.g. whether their stances on the law were good or bad, whether they were just or unjust, whether they were strict or lenient in their judgments, etc. As such, there is no actual *criticism* or *commentary* about these figures. Therefore, these memes are not transformative as defined by fair use law.

20.     That's not to say that two words alone can never be considered criticism, per se. But those two words must still actually *say something about* the subject. As a counter-example, I proffer the line spoken at 3:21 – 3:31 of this YouTube video: https://youtu.be/Azw79Y0aqBk?t=201 While the focus of that video was on the individuals who send him hate mail, one part of that sentence has him referring to Bobby Kotick (CEO of Activision) as a "billionaire bastard." This is only two words, but it still tells us something about this person's opinion of Bobby Kotick. The second word tells us that he considers Bobby Kotick to be an all-around unlikeable and unpleasant person, while the first word tells us that his vast wealth (and more specifically, his greed, selfishness, and cutthroat business tactics which lead to him amassing said wealth) is the primary reason for his unlikeability. He certainly goes into more detail in several other videos on his channel, but even if you've never seen any more of his videos and have no desire to, these two

words still serve as an effective and succinct microcosm of this person's opinion about Kotick.

21.     But here? The two words "Acerthorn Laws" tell us nothing. It just gives us absolutely nothing to go on. It doesn't even count as a microcosm. Much like in Seuss v. Comicmix, , 983 F. 3d 443 (9th Cir. 2020), this Court should "reject as 'completely unconvincing' [Defendant]'s 'post-hoc characterization of the work' as criticizing." See id at 453. Like there, the connection here is dubious at best. To be considered transformative, the amount of creative effort spent drafting the alleged criticism is a paramount consideration. See Castle Rock v. Carol, 150 F. 3d 132, 142 (2nd Cir. 1998) ("[H]ad defendants been half as creative in creating The SAT as were their lawyers in crafting these arguments about transformation, defendants might have a colorable fair use claim"). Likewise, the near total lack of creative effort expended in creating this threadbare meme should be rejected by the Court as transformative.

22.     It is telling how this complaint received not one, but two sua sponte reviews for sufficiency of claim, under 28 USC § 1915, and the Copyright Claims Board's equivalent thereof, both determining that the alleged infringement cannot be declared fair use at this stage, before the defendant finally buckled down and gave us anything remotely resembling an explanation for the alleged "transformative" value. In their Motion to Relate, the Defendant insisted that the icon was "clearly" fair use for reasons that should be obvious to any reasonable person, yet two (and possibly even three, if you count Judge White's summary order) tribunals simply failed to see it. This is a testament to just how obtuse and esoteric this alleged "criticism" is, if it even exists at all. In this motion, the Defendant insists that the words "Acerthorn Laws" is "an unmistakable reference to[4]" my history with the Courts, but the fact that it passed sua sponte review, not once but twice, is clear evidence that it anything but "unmistakable."

23.     In Hughes v. Benjamin, the Court found the infringing video transformative in large part because "a reasonable observer who came across the video would quickly grasp its critical purpose … a reasonable observer would plainly infer from the title of Benjamin's video, the context in which it was posted, and its selective copying, that it was intended to criticize Hughes" See id at 392. But here, the opposite is true. As the past tribunals have shown, a reasonable person cannot be expected to grasp its critical nature (if there even is any) unless

---

4   p. 8, lines 10-11; also p. 19, lines 6-7

several pages are written explaining it. Opposite circumstances should render opposite results.

24.    For this reason alone, the icon should be declared "non-transformative," since it fails to provide any actual criticism. Simply saying "Acerthorn Laws" is not criticism, but a writing prompt; it certainly gave the Defendant something to write about, and that content could arguably be considered criticism. But the two words, alone, are merely a writing prompt, and writing prompts are not transformative by themselves. At best, the icon could be considered "nominally transformative," but even that will not be enough to save it from onslaught of upcoming sub-factors that weigh against fair use.

<u>IV-4-B: ATTA's true purpose</u>

25.    Up to this point, however, we have been overlooking one very important detail: To be fair use, the *purpose* must be to criticize. It is not enough for a third party to be able to glean some transformative value out of a work, independently of what the direct infringer intended.

26.    Fortunately, we are in luck, because the Federal Rules of Evidence explicitly state that a party's prior (or, in this case, concurrent) actions are admissible to prove this very thing. See Fed.R.Evid. 404(b)(2). To that end, let's have a look at ATTA's actions related to this channel, and see what we can find. Please remember that the Court must accept as true any allegations I make in the complaint unless it can see otherwise with its own two eyes (which it no longer can do).

27.    First, as I pointed out in the Complaint, the words "Acerthorn Laws" had portions of them cropped out. This heavily implies that ATTA saw these words – the only part of the icon which the defense even *attempts* to pass off as transformative – to be expendable. What he truly sought to preserve was the smug facial expression, not the actual criticism … because his purpose was never to criticize me in the first place.

28.    Second, his video library was majority composed of verbatim, unaltered clips from my videos, and even whole videos in their entirety, with no alterations or modifications whatsoever, let alone transformative ones. As I pointed out in the Complaint, "[i]t is clear, at this point, that ATTA is not actually concerned with fair use. Any nominal transformative value that ends up on his channel is entirely incidental. It is clear that he is not curating his content based on what is

fair use." In Hughes v. Benjamin, the Court noted that "the critical nature of SJW Levels of Awareness is apparent from the broader context of Benjamin's YouTube channel, where it was posted." See id at 391. But here, the "broader context" of ATTA's channel clearly shows a total *lack* of critical nature. Again, opposite circumstances should render opposite results.

29.     Third, almost immediately after I filed this lawsuit, ATTA deleted his channel in shame. This is smoking gun evidence of a guilty conscience.

30.     All three of these acts lend credence to my allegation in the Complaint, that the ATTA YouTube channel was dedicated to harassing, doxxing, and impersonating me, rather than critiquing my work. Therefore, none of the channel's content was made with the "purpose" of criticizing me.

31.     If the defense wishes to insist that ATTA's true purpose with the icon was indeed to criticize me, they have to call him as a witness, have  him testify as to his own intentions, and be subject to cross-examination by me. But it cannot be disposed of on a motion to dismiss.

<u>IV-4-C: The sub-factors that weigh against fair use</u>

32.     Even if, despite all of this, the Court insists on finding the icon to contain some criticism, the discussion of the first factor does not end here. As Exhibit A clearly shows, there are plenty of sub-factors that have the potential to weigh against fair use, and most of them are applicable here. Nominal transformative value can be nullified with a strong showing of these sub-factors weighing against it. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012) ("Maya's minimal transformation of the photos is substantially undercut by its undisputed commercial use. On balance, the first factor is at best neutral, and does not support Maya's claim of fair use").

33.     *Commercial Activity & Profit* – Even if ATTA did not make any effort to monetize his channel (and that has yet to be proven), that only matters if ATTA was the primary defendant in this case, which he is not. Google LLC is the primary defendant, and they are, beyond a shadow of a doubt, a commercial, for-profit enterprise. Any attempt by the Defense to deny this would be inherently frivolous.

34.     Furthermore, YouTube (a fellow subsidiary of Alphabet, Inc. and XVII Holdings, Inc.)

runs advertisements on all YouTube channels and all YouTube videos, even if those channels are not part of the YouTube partner program[5]. This means that YouTube (and by extension, the same shareholders who have a vested interested in Google LLC's bottom line) was indeed profiting off of ATTA's channel icon.

35.     Therefore, this sub-factor weighs against fair use.

36.     *Entertainment* – There is a very high likelihood that the ATTA YouTube channel was designed to provide entertainment to its audience. Sick, twisted, demented entertainment, but entertainment nonetheless. As evidenced by his video library, his entire purpose for this channel seems to be to have me put on public display for mockery and degradation, like a circus freak. Except those circus freaks at least got a paycheck for all the humiliation and verbal abuse they had to endure[6]; I haven't gotten diddly squat! This transitions nicely to the next sub-factor:

37.     *Bad-Faith Behavior* – "Because fair use presupposes good faith and fair dealing, courts may weigh the propriety of the defendant's conduct in the equitable balance of a fair use determination." See Stern v. Does, 978 F. Supp. 2d 1031, 1046 (C.D. CA 2011) (citing Fisher v. Deez, 794 F. 2d 432 (9th Cir. 1986), which in turn cited Harper & Row v. Nation).

38.     This is perhaps the most important sub-factor of the entire First Factor, because it has the potential to negate fair use in its entirety. After all, if, as I alleged in the complaint, the direct infringer's intention this whole time was to harass me, dox me, impersonate me, and simply infringe on my copyright without even *trying* to make it fair use, then that means that ATTA has acted with "unclean hands" when running this channel, and unclean hands is a counter-defense to fair use. When passing the 1976 statute that is the current applicable Copyright Law, "The House Report expressly stated that the fair use doctrine is an 'equitable rule of reason.'" See Sony Corp. of America v. Universal City Studios, Inc., 464 US 417, 448 n. 31 (1984). "From this ... it would follow that unclean hands and all other equitable considerations are pertinent." See Leval, P.

---

5   See https://www.forbes.com/sites/johnkoetsier/ 2020/11/18/youtube-will-now-show-ads-on-all-videos-even-if-creators-dont-want-them/.

6   See https://priceonomics.com/the-rise-and-fall-of-circus-freakshows/ (""I'm stared at but it doesn't bother me. Nor does it bother the freaks when they are stared at on their way to the bank to deposit the $100, $150, $200, and even $500 per week that some of the more sensational human oddities receive for their showing in the sideshows" … "If you're a mutation of sorts, the biggest thrill you get is opening the mailbox and getting a check").

(1990). Toward a Fair Use Standard. Harvard Law Review, 103(5), 1105. doi: 10.2307/1341457.

39.     In that treatise, Leval would go onto admonish the judiciary for assuming that fair use is equitable, and explain how the history of fair use shows that it originated in law, not chancery. But guess what: *That doesn't matter!* Even if it was erroneous for the judiciary to slowly gravitate towards seeing fair use as an equitable rule, it doesn't matter what the courts of the 19th and early 20th centuries thought. As of the Copyright Act of 1976 (the current one), fair use's status as an equitable rule is, for better or worse, codified by Congress.

40.     And since fair use is now codified in law as being equitable, that means unclean hands is an exception to it.

41.     The defendant's attempts to argue that Google v. Oracle changes this are clearly false. First, that was only dictum; in fact, the Supreme Court explicitly said it was dictum when they said "We have no occasion here to say whether good faith is as a general matter a helpful inquiry" *immediately after* stating what the Defendant recites. Second, short of declaring the law unconstitutional (which they have not done here), the Supreme Court cannot nullify the express Congressional intent[7] that fair use is meant to be an equitable rule. Third, even the *unpublished* opinion of Divine Dharma, supra (which, for the record, is *unpublished*) still concedes that bad faith has at least some relevance in a fair use determination. "Minimizing" the role of bad faith is not the same as abolishing it. This means that it can't be disposed of at the pleading stage because we still need to develop the facts to know just how relevant it is.

42.     Fourth (and most importantly of all), their own assertion is self-defeating. In order to adopt it, the Court must also reject the defendant's assertion that I am just trying to silence criticism.[8]

43.     What do I mean by that? Well, when the Supreme Court said that "copyright is not a privilege reserved for the well-behaved," they were reciting an excerpt from the aforementioned treatise "Toward a Fair Use Standard" by Pierre Leval. However, if you actually go and *read*

---

7   The legislative intent is generally considered to be second only to the "plain meaning rule" in terms of statutory construction, and the Committee Notes are indispensable in identifying legislative intent.

8   For the record, I am not conceding that I am simply attempting to silence criticism. I'm saying that the Defendant is a hypocrite who operates under a "rules for thee, not for me" mentality when it comes to copyright and fair use. There's a big difference.

*what he wrote*, you realize that he was actually going to bat for precisely the type of behavior that the Defendant complains of in this case: Suing for copyright infringement just to silence criticism! Rather, Leval's logic was that, if plaintiffs are allowed to do that, it's only fair that defendants get to claim fair use even when they act in good faith, because fair is fair. See id at 1127-28:

> "The temptation to determine fair use by reference to morality also can lead to examination of the conduct and intentions of the plaintiff copyright holder in bringing the suit. The secondary user may contend that the copyright holder is disingenuously invoking copyright remedies as a device to suppress criticism … Like a proprietor of land or an owner of contract rights, the copyright owner may sue to protect what he owns, regardless of his motivation."

44.    Therefore, according to the very logic upon which the Defendant relies to make its case that ATTA's bad faith harassment and doxxing is irrelevant, they must likewise abandon the accusation that I am simply attempting to silence online criticism. According to the very precedent they defer to, either both are relevant or neither are relevant. It's only fair.

45.    If you disagree with Leval's logic entirely, then that just means we're back to square one, with fair use's status as an equitable rule being codified by Congress without any authority to contradict that.

46.    But one thing the Defendant absolutely should not be allowed to argue is that the good faith requirement is only a one-way street, that the plaintiff has to act in good faith at all stages of the matter, but the defendant does not. That would be the epitome of an unfair legal system.

47.    So no matter how you slice it, ATTA's clear bad faith (as clearly evidenced by his overtly malicious and inequitable actions before taking his channel down) weigh very heavily against fair use. At the very least, I should be afforded my day in court and given a fair opportunity to *prove* that ATTA is seeking only to harass and dox me, rather than criticize me. This means that the case cannot be disposed of on a motion to dismiss.

### IV-4-D: Wrapping Up Factor #1

48.    To bring the first factor of fair use to a close, the defendant's case is, in a word, laughable. They have to dig deep into my past just to make even the most threadbare of cases for criticism. The icon is practically hooked up to a life support machine in order to create even a threadbare

case for it being considered transformative, but all that really does is demonstrate just how much the icon can't be considered transformative on its own merit. If they have to work this hard to squeeze even a drop of water from this stone, it's not a stone worth squeezing.

49.     But even barring that, what little criticism they were able to glean out of the icon is quickly evaporated in the face of the multitude of sub-factors that weigh against it. As I pointed out at the start of this section, it's not a question of *whether* the icon *is* transformative, but rather, *how transformative is it*? Simply being "minimally transformative" isn't good enough. The Defendant clearly disagrees. They insist that the minimal criticism provided is "crude,"[9] but sufficient. But clearly established binding precedent states otherwise.

50.     Just like in Monge, "the first factor is at best neutral, and does not support [the Defendant]'s claim of fair use." See id at 1177.

### IV-5: Factor #2: Nature of Original

51.     The defense insists that the underlying work is "minimally creative," but it is clear that nothing could be farther from the truth. Opinions and commentary are, in and of themselves, creative, even if they discuss nonfiction events. See Hughes, supra at 393 ("Hughes's work is 'factual or informational' in that it provides a first-hand account of a newsworthy event, but it also has 'expressive or creative' value in both its commentary and production").

52.     At that point, it becomes a simple math problem. Assuming that the average personal opinion takes approximately five seconds to express, the original video (which was 3 hours, 52 minutes, 28 seconds long) would contain approximately 2,789 opinions. If we further assume that a work needs a "creativity score" of 100 or greater to be considered "highly creative" for the purposes of the second factor of fair use, and we further assume that a single personal opinion about an otherwise factual matter has a "creativity value" of 0.1 (which would make it "minimally creative" if that one opinion were literally the entire copyrighted work, like a TikTok video, a meme, or a tweet), then my video has an overall "creativity score" of 278.9, just on the opinions alone, not even counting my facial expressions. That makes it eligible to be considered "highly creative," twice over, with creativity to spare.

53.     The Defendant's attempt to claim that my lack of production value is somehow proof that

---

9  p. 21, line 3.

the video is minimally creative is absurd. Production value is not the only way a work can be considered creative. If it were, novels would be considered "minimally creative," since they typically amount to little more than text on a page. Also, podcasts would be minimally creative, since they typically are audio-only. Whenever visuals are typically added, they tend to be designed to be unobtrusive to audio-only listeners. Whenever visuals are added, they tend to just show the people in the podcast simply sitting at a desk and talking to each other[10], with no special effects or creative videography whatsoever, just like what the defendant says is what makes my video minimally creative.

54.     But that's okay, because the expressing of opinions is, in and of itself, inherently creative, and courts all over the nation recognize that. This means that expressing lots and lots of opinions over the course of several hours constitutes lots and lots of creativity.

55.     Put simply, the defendant's insistence that the underlying video is "minimally creative" has no basis in reality. The Court should reject this frivolous argument.

IV-5-A: Inglewood &amp; Political Speech

56.     The Defendant cites the *unpublished* case (which is *unpublished*) of City of Inglewood v. Teixeira, 2015 WL 5025839 (C.D. Cal. Aug. 20, 2015) in support of its case. But this case could not be any more different from that one in terms of the second factor of fair use. As implied by the name of the plaintiff, the underlying work documented a *political* event (specifically, the recording of a city council meeting). This means that any criticism connected to that recording is necessarily an act of "political speech." This creates a universe of difference between that case and this one.

57.     Political speech is generally regarded as enjoying the *absolute pinnacle* of First Amendment protection, *the* cream of the crop, *the* peak of the mountain. Political speech is matchless in its protection under the First Amendment. See Snyder v. Phelps, 562 US 443, 1211 (2011). So, in Inglewood, the second factor didn't simply favor fair use. It favored fair use *ten times over*! Whereas the second factor is typically the least important factor in a fair use analysis, political speech is probably the one thing that would cause the second factor rival the "criticism" sub-factor in terms of overall importance.

---

10  Such as this example: https://youtu.be/2O-iLk1G_ng

58.     As such, the Defendant's attempt to cite Inglewood v. Teixeira (which is *unpublished* in any event) as precedent in this case is laughable.

<u>IV-5-B: It is the portion copied, not the overall work, that matters</u>

59.     Even barring all of this, the Defendant's insistence on the "minimal creativity" of the video is inherently misguided, because it is the portion that ATTA copied, not the overall work, that should determine whether the second factor favors or opposes fair use.

60.     It is entirely possible for works to be a mixture of factual and creative. Take, for example, this history documentary that originally aired in the late 2000s: https://www.youtube.com/playlist?list=PL3BrCRgvsZ9BTtb4kcxgaNYaCIawFr53c. That series documents the history of the USA, which is factual, but it also casts modern actors and shoots skits with them in order to reenact various historical events, which is creative.

61.     If I were criticizing that series for its historical accuracy (e.g. if I were criticizing how it credited William Sherman with leading the Union to victory in the American Civil War when I had always known it was Ulysses S. Grant who did that), that is factual, which means the 2nd factor would favor fair use. But if I were criticizing anything about the skits, then it would be creative, so the 2nd factor would oppose fair use. See Hosseinzadeh v. Klein, 276 F. Supp. 3d 34, 46 (SD NY 2017) (finding second factor opposes fair use, even when real-life events serve as the inspiration).

62.     Taking that logic and applying it to the instant case, it's clear that the second factor opposes fair use. The Defendant insists that my discussions during that video were minimally creative. But even if that were the case (which I oppose; see above), that only really helps the Defendant if that were the portion which ATTA actually copied. Instead, he copied a facial expression from that video. Moreover, it is obvious that he chose that frame, as opposed to any other of the countless frames in that video, primarily because of how ***expressive*** that face was!

63.     Because it was that portion, not any of the discussions that the Defendant insists are "minimally creative," that was infringed upon, that is the portion that must be analyzed under the 2nd factor. Upon realizing that, it becomes inevitable that the second factor must weigh against fair use.

## IV-6: Factor #3: Amount & Substantiality

64.     While I concede that only one frame was used, in order to get fair use at the pleading stage, the defendant must also show that the copied image was not the "heart" of the work. After all, the third factor would also weigh against fair use if the copied facial expression was the heart, which in turn means that it cannot be said that I can prove "no set of facts" which would entitle me to relief.

65.     The Defendant's attempt at claiming that this facial expression is not the heart of the work is, to put it mildly, stretching. They insist that the things I said during this video are the heart, yet they insist earlier that these opinions do not elevate the work above "minimally creative." You cannot have it both ways. Either these opinions are not creative, which means they cannot be considered the "heart" of the work (which in turn means that this facial expression is the heart, owing to a lack of competing content), or they are the heart, which means they have creative value in and of themselves. Pick one.

66.     Even if the opinions have inherent creative value, the facial expression can still very easily be considered the heart of the work. All a specific part of a work needs, in order to be considered the "heart," is to be the "most memorable aspect" of the work. See "Measuring Fair Use: The Four Factors" at https://fairuse.stanford.edu/overview/fair-use/four-factors/. That can come about in an infinite number of ways.

67.     More importantly, it is the audience, not the author, that determines which part of a work is the "most memorable aspect" part. For example, here is a moment from the professional wrestling even called "The Greatest Royal Rumble" that is generally considered by *the fanbase* to be the most memorable part of the entire show: https://youtu.be/JUJfDF6yg04

68.     Obviously, WWE did not produce that show with the intention of that moment being the most memorable part of the show, owing to the simple and obvious fact that they never "intended" for that moment to happen at all. But that doesn't matter. It ended up that way, and therefore, that moment is the "heart" of the work, not because WWE says so, but because *the fans* say so.

69.     In the instant case, there are many opinions expressed during that video, but the fact that

there are so many of them means that they all blend together. Much more so than any opinion stated in that video, this facial expression appears to have transcended the actual discussions of that video and become the most popular and memorable aspect in the video. Even if that wasn't my intention when I scheduled to do the video with Montyspa, that's how it turned out. Therefore, that facial expression is still the "heart" of the work.

70.     The Defendant disagrees with me on this. I understand that. However, on a motion to dismiss, the Court can only grant the motion if it is clear that I can prove no set of facts that will entitle me to relief. Therefore, the Court must, at least for the time being, accept that this facial expression is the "heart" unless there is simply no chance in hell that it could possibly be considered the heart. Since the Defendant obviously cannot prove that at this stage, the motion must be denied.

### IV-7: Factor #4: Effect on the Market

71.     "This last factor is undoubtedly the single most important element of fair use." See De Fontbrune v. Wofsy, 39 F. 4th 1214, 1226 (9th Cir. 2022) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)). Moreover, it is the one factor that has been expressly affirmed by the Supreme Court as being singularly capable of negating fair use in its entirety, all on its own. "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." See Monge, supra at 1182 (emphasis in original). "If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair." Harper & Row at 568.

#### IV-7-A: Defendant's Baseless Argument

72.     In their motion to dismiss, the defense offers absolutely no evidence whatsoever in support of its baseless contention that the icon has no material impact. The 9th Circuit has unequivocally held that this is not enough to prove fair use, even on a motion for summary judgment, let alone on the much stricter motion to dismiss. See Monge, supra at 1181 ("Maya does not offer any evidence of the relevant market or the lack of market harm from its publication other than broad, unsubstantiated statements in its brief") (citing Campbell, supra at 590).

73.      The Defendant complains that I have "not alleged that there is any economic market for the Livestream or its derivatives, let alone that the channel icon somehow usurps that market or fulfills demand for his content." See p. 24, lines 17-19. But I am not required to allege that in the Complaint. I am not required to allege fair use *at all* in the Complaint. See Peterman v. Republican National Committee, 320 F. Supp. 3d 1151, 1157 (MT 2018) ("[I]t is not necessary to plead facts that disprove fair use to survive a Rule 12(b)(6) motion to dismiss"). Indeed, the fact that the Defendant snickers at my attempts to explain a lack of fair use in the Complaint[11] shows that they understand this much. As such, the mere fact that I failed to allege this in the Complaint cannot be used against me.

74.      The Defendant's citation of Savage v. Council on American-Islamic Relations, Inc., No. C 07-6076 SI (N.D. Cal. Jul. 25, 2008) is a fairly weak attempt to show that I am indeed required to allege otherwise. This *unpublished* case contradicts the *published* opinion of Peterman v. RNC, and also contradicts the *binding precedent* of Campbell v. Acuff-Rose , which states that, when the use is commercial[12], likelihood of market harm "may be presumed," (see id at 591, citing Sony v. Universal, supra at 451), as well as the *binding precedent* of Seuss v. Comicmix, which unequivocally calls upon the defendant, "as the proponent of the affirmative defense of fair use," to "bring forward favorable evidence about relevant markets," and stating that this is one of the few "absolute statements" when it comes to fair use. See id at 458-460.

75.      Second, this *unpublished* opinion further demonstrates how erroneous it is when it goes on, in that same paragraph, to find "It is reasonable to believe that plaintiff did not anticipate a future sale of, or future market for, the content arising from his comments made on a call-in show." This finding, however, explicitly contradicts the *binding precedent* of Monge v. Maya Magazines, Inc., 688 F. 3d 1164 (9th Cir. 2012), which holds in pertinent part that a derivative market is not forfeited by the copyright holder simply because the plaintiff had not, at the time, publicly expressed any interest in entering that derivative market, or even if he had explicitly disavowed any intention of entering the market! See id at 1180:

---

11  p. 15, lines 4-5 ("he spends several pages in the Complaint defensively arguing that the image is not a fair use").

12  As was established when discussing the sub-factors of Factor #1, Google is undoubtedly a commercial, for profit entity, so this qualifies.

""Maya argued, and the district court agreed, that no potential market for the pictures existed because the couple did not intend to sell publication rights to the photos. The district court's legal conclusion that the potential market was destroyed due to the couple's then-present intent regarding publication ***was in error***." (emphasis added)

76.     So clearly, the *unpublished* opinion upon which the Defendant relies is not valid in this case.

77.     The Defendant insists that critical content "could not possibly usurp"[13] any market, derivative or otherwise, as a matter of law. But they offer no legal authority stating as much. Nor do they offer any proof that, as a matter of fact, it is physically impossible for critical works to serve as a market substitute for derivative works, literally just as impossible as immortality or faster-than-light travel. This complete lack of evidence is par to the course for the defendant at this point.

<u>IV-7-B: Sub-Factors that Weigh Against Fair Use</u>

78.     In addition to that, let us once again refer to the checklist in Exhibit A and examine all the sub-factors.

79.     *"User Owns Lawfully Acquired Copy... of Original Work"* – ATTA does not "own" any copy of the underlying work. By creating a YouTube account, he was given permission to view the copy that was uploaded to my YouTube channel, but that does not make him the owner of a copy, any more so than buying a ticket to a movie theater makes you the owner of a copy of the movie you're about to watch. This subfactor does not weigh in favor of fair use.

80.     *Effect on the Potential Derivative Market* – When analyzing fair use, the Court "must take account not only of harm to the original but also of harm to the market for derivative works." See Campbell v. Acuff-Rose Music, Inc., 510 US 569, 590 (1994). The right to charge a licensing fee for use of channel icons is a derivative market which this icon clearly intrudes upon.

81.     "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." See id. Even in <u>Hughes v. Benjamin</u> (the most famous recent example of fair use being found on a

---

13  p. 24, lines 23-34.

motion to dismiss), the Court made the finding of favorable evidence of relevant markets primarily using facts that are common knowledge, namely the heavily polarized state of modern American political discourse. See Hughes, supra at 394. But here, the state of relevant markets are far from common knowledge.

82.     As for derivative markets, it is not necessary that I be actively involved in the derivative market, nor is it necessary that I have expressed interest in that, or any other, derivative market.

(a)     See See Rogers v. Koons, 751 F. Supp. 474, 480 (SD NY 1990)"

"Rogers had expressed no prior interest in the art rendering submarket prior to this litigation … I do not think the case turns upon Rogers' past conduct or present intention as much as it does upon the existence of a recognized market."

(b)     See also Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1180 (9th Cir. 2012):

"Maya argued, and the district court agreed, that no potential market for the pictures existed because the couple did not intend to sell publication rights to the photos. The district court's legal conclusion that the potential market was destroyed due to the couple's then-present intent regarding publication *was in error*." (emphasis added)

83.     Remember that, in a fair use defense, not only does the defendant *always* hold the burden of proof, but this is one of the few "absolute statements" when it comes to fair use. See Dr. Seuss Enterprises, LP v. Comicmix LLC, 983 F. 3d 443, 459 (9th Cir. 2020). So the defense's inability to satisfactorily prove a lack of derivative market harm in this case is crippling to their hopes for fair use, if not singularly fatal[14]. It certainly is fatal to their attempts to get the case dismissed at the pleading stage, owing to the high legal threshold for dismissal for failure to state a claim.

84.     *Available/Affordable Licensing Mechanism* – While it may be true that I do not have an account set up with the likes of shutterstock.com or some similar site whereby people can add my images & videos to their cart, pay a predetermined licensing fee, and then get the rights to use my copyrighted work without ever interacting with me directly, that does not mean that no licensing mechanism exists. As the Court can see by going to my YouTube channel and checking the "about" tab[15], I have an email address publicly available for business inquiries. You have to

---

14  Remember: This factor alone can singlehandedly negate fair use, all on its own.
15  www.youtube.com/c/acerthorn/about

complete a captcha to see the email address, but that's it.

85.     If ATTA had reached out to me over email and made a reasonable offer for the right to use my face as his channel icon (e.g. $50 for a five-year license to use the icon on that one channel and no others), I likely would have said yes. I still would have issued DMCA Takedowns against all the videos that were not fair use, but the icon (and *only* the icon) would have been allowed. As long as I was compensated for the use of my copyrighted work, I would have gladly taken the money, and ATTA wouldn't even have had to make any changes to it! You don't need fair use if you get a license!

86.     So, because licensing was both available and affordable, both of these sub-factors are applicable and therefore weigh against fair use.

87.     *Accessible on the Web & in a Public Forum* – Just like with Google being a commercial, for-profit entity, the fact that this sub-factor is present and weighs against fair use cannot be disputed by anyone in their right mind.

88.     *Repeated or Long-Term use* – The icon was most likely created on or around April 10, 2022 before being deleted right after this lawsuit got filed, on or around January 25, 2023. It certainly existed as of August 4, 2023, the date of the DMCA Takedown. This means that the icon was up for months and months. This counts as long-term use. Therefore, this sub-factor weighs against fair use.

IV-7-C: Wrappng up Factor #4

89.     In conclusion, literally all of the sub-factors here weigh against fair use. With Factor #1, they made a strained case for criticism that required copious amounts of backstory, but here, the defense does not have even that much. It's literally a clean-sweep of sub-factors weighing against fair use. All they have is their wholly unsubstantiated allegations that the icon "could not possibly usurp" any of my markets, but they do not even try to prove that.

90.     Since this is the single most important factor of fair use, the defense's failure to have even one sub-factor even nominally weigh in their favor is devastating to their claim.

**IV-8: Wrapping Up Four Factors Test**

91.     Overall, there is not a single factor that definitively weighs in favor of fair use. The

closest they can possibly get to calling it transformative is by digging into years and years of my personal history in a strained attempt to read criticism into the icon that clearly isn't there. Even then, they have to ignore wholesale the multitude of sub-factors that weigh against fair use. Only by pretending those sub-factors don't even exist at all can they make even the most threadbare case for fair use.

92.     They insist that the original work is "minimally creative," but the only way they can even come close to sounding non-frivolous is by laser-focusing on the production value, completely ignoring the multitude of other ways in which a work can be creative. They have not even tried to explain how this facial expression is not the "heart" of the work, aside from their baseless and unsubstantiated allegations that it's not the heart. Meanwhile, they don't even attempt to make even so much as a threadbare showing that the icon does not infringe upon my derivative markets.

93.     Reviewing the checklist shown in Exhibit A in its entirety, only three sub-factors even nominally weigh in favor of fair use (and that's assuming the "criticism" sub-factor is indeed applicable, which it most likely isn't), while a whopping 11 sub-factors weigh against it. That means that only 20.4% of sub-factors even nominally weigh in favor of fair use, while a whopping 78.6% of sub-factors weigh against it.

94.     And all of that is assuming that neither the harm to derivative markets, nor the counter-defense of unclean hands, singlehandedly kill the defense's fair use claims all by themselves.

95.     In short, the defendant has put forth a rather pathetic case for fair use. They certainly have not satisfied the incredibly high threshold for dismissal on the pleadings for failure to state a claim.

**IV-9: The case is not frivolous, so declaring me a vexatious litigant is inappropriate.**

96.     If, in spite of all of this, the Court still feels that dismissal on the pleadings is justified, I at the very least urge the District Court not to find the case frivolous. It is well-established precedent that a court cannot find a lawsuit to be frivolous simply because the Plaintiff loses. To be frivolous, the lawsuit must lack "even an arguable basis in fact or law … When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved

against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate, but dismissal on the basis of frivolousness is not." See Neitzke v. Williams, 490 US 319, 328 (1989).

97.      The fact that I have provided extensive factual arguments explaining why the icon isn't fair use, and backed up my legal arguments with copious citations of case law (most of which is binding precedent, only occasionally borrowing from New York & 2nd Circuit case law, none of which is expressly contradicted by the 9th Circuit), proves that there is at least ***an arguable basis*** for this claim, even if "the district court ultimately finds [the case to be] correctly resolved against the plaintiff." By contrast, it is the defendant, not me, who has provided an objectively unreasonable case for fair use.

98.      For this reason, even if the Court chooses to dismiss the case for failure to state a claim (which it shouldn't), the case should still be declared "non-frivolous." Therefore, it would be inappropriate to declare me a vexatious litigant because of this case. This case can only be considered "the last straw" for this Court if it truly is frivolous, which it is not.

99.      Just to show how non-frivolous this case is, I offer **Exhibit C**. For the record, I did indeed consult with legal counsel before filing this case, although that consultation is protected by the attorney-client privilege. This email conversation, on the other hand, is not privileged. This guy claims to be a lawyer[16] who handles "similar issues" (aka copyright). This was sent to me while the CCB case was still open. In this email conversation, he attempted to bring to my attention a deficiency he saw in my case. However, it wasn't that the icon was undoubtedly fair use; it was that he believed I had sued Google when I should have sued YouTube.

100.      Here, the Defendant *admits* that I properly sued Google instead of YouTube (see Dkt. 31, p. 15, lines 6-7). So that factual dispute is properly resolved in my favor. However, the fact that this lawyer felt the need to personally reach out to me to bring this to my attention, but didn't feel the need to address the case for fair use, heavily implies that he did not see "fair use" as an issue worth bringing up. In other words, he admits that the icon isn't fair use. Bear in mind that this man was still able to see the channel for himself, as ATTA had not deleted his channel at this point, and he still implicitly agreed with me that the icon isn't fair use.

101.      This is a testament to just how non-frivolous my case is. This clearly proves that, even if

---

16 He makes this claim on Page 2 of the exhibit. The relevant portion is highlighted so you can see it easily.

the Court finds fair use, this is still clearly a case in which reasonable minds may differ, so the case should not be declared frivolous and I should not be declared vexatious.

### IV-9-A: A pre-filing review is unnecessary because it is redundant.

102.     Barring that, the exact restrictions the Defendant requests are entirely unnecessary. First, they request that I not be allowed to bring any more claims against Alphabet Inc. or any of its subsidiaries unless the Court first acknowledges that I have stated a claim upon which relief can be granted. However, once again, they ignore the cast-iron objective fact that such a review has already taken place in this case, not once but twice, on two separate occasions by two different tribunals. See Case 4:21-cv-04184-JSW (Stebbins v. Polano), Dkt. 179, ¶¶ 47-53. The implication with the Defendant's proposed order is that this review restriction will filter out cases just like this one that should never have even gotten off the ground, but they stubbornly refuse to accept the reality that *this very review* was already applied to *this very case*, on two separate occasions, yet this case still got "off the ground." Clearly, requiring this review will serve no purpose, since it is entirely redundant of what has already happened.

103.     The fact that the Defendant refuses to accept this truth, even after it was already shot down by Judge White[17], just shows that it is the Defendant's sense of self-entitlement, not me filing a frivolous lawsuit, that makes them request the relief they request.

### IV-9-B: Barring IFP status in the future is going too far.

104.     Second, the Defendant asks that I be barred from ever proceeding in forma pauperis in this court ever again, no matter who the defendant is. If this were put in place, it would prohibit me from being able to bring any claim in this District. Courts should be extraordinarily hesitant about imposing restrictions that would have the de facto effect of stripping a litigant of his constitutional right to court access in its entirety.

### IV-9-C: The Pro Bono Office already provides a sufficient safeguard against patently frivolous filings.

105.     Third, we mustn't forget that, unlike most other district courts in the nation, this Court has a pro bono program to assist pro se litigants such as myself avoid the most common pitfalls in litigation practice that typically get them declared vexatious litigants. See

---

17  See Case 4:21-cv-04184-JSW (Stebbins v. Polano), Dkt. 180.

https://cand.uscourts.gov/attorneys/federal-pro-bono-project/. I use that office regularly. In fact, with this very motion, I took the proactive step of booking an appointment with them before the Defendant's motion to dismiss even got filed. See **Exhibit D**.

106.    Therefore, even if, in the already unnecessary case that the Court sees fit to impose any restrictions on my future filings, it should be far more lenient on me than most other Courts would be, since, in addition to the § 1915 review, this pro bono service provides an extra layer for filtering out frivolous[18] claims, making additional restrictions even more unnecessary than they would be in another district under otherwise identical circumstances.

## V: CONCLUSION

107.    Wherefore, premises considered, I respectfully pray that the Defendant's motion to dismiss be denied.

Submitted on March 20, 2023.

*/s/ David Stebbins*
David Stebbins (pro se)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

---

18 Truly frivolous claims, not just claims that the Defendant disagrees with. Of course the Defendant is going to automatically assume that any lawsuit against them is inherently frivolous, simply because they are the ones being sued. Even if they lose the lawsuit, are forced to pay damages and attorneys fees, and even if they are sanctioned under Rule 11 for making patently frivolous defenses, they will still insist to their dying breath that the lawsuit was frivolous, simply because they were the ones being sued.