ADavid Stebbins (pro se Plaintiff)    123 W. Ridge Ave., APT D, Harrison, AR 72601
(870) 212-4947        acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                                        PLAINTIFF

VS.                                   Case 3:23-cv-00322-TLT

GOOGLE, LLC,

YOUTUBE, LLC                                                        DEFENDANTS

JOHN DOE, d.b.a. "ACERTHORN THE TRUE ACERTHORN"

**FIRST AMENDED COMPLAINT**

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following First
Amended Complaint against Google, LLC and YouTube, LLC for three (3) counts of copyright
infringement.

**I: PARTIES TO THE CASE**

1.      I am a Youtuber and Twitch streamer who goes by the alias "Acerthorn." My Youtube
channel can be found at the url of www.youtube.com/@acerthorn, and my Twitch channel can be
found at the url of www.twitch.tv/acerthorn.

2.      The two corporate defendants are both wholly owned subsidiaries of Alphabet, Inc.
Google is the world's largest search engine website, and YouTube is the world's largest video
sharing website. Google has already appeared in this case, so they don't need to be served with
process again. YouTube, LLC will almost certainly be represented by the exact same legal
counsel as Google, so there is a very high probability that they will simply waive service.[1] In the
event that they do not consent to that, YouTube LLC can be served with process at the following
registered agent:

3.      Defendant John Doe (the only individual defendant) is an unkown person who previously

---

[1]   In my Motion for Leave to File this Amended Complaint, I have asked the defense counsel to specify whether
they will consent to receiving service on behalf of YouTube LLC in their response to that motion. Obviously, as
of the time of this writing, I have no way of knowing if they will oblige that request, and this Court obviously
cannot force them to do so.

operated under the alias "Acerthorn the True Acerthorn" (or ATTA, for short). In late January 2023, he deleted his YouTube account, but prior to deleting it, his channel could be found by going to the url of  https://www.youtube.com/@acerthornthetrueacerthorn4532.

4.      I do not currently know Doe's name or address, so YouTube, Google, and I will have to conduct initial discovery in order to find him, using their extensive records of his online activities, before he can be served with process.

## II: JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this case because, as a case for copyright infringement, it has federal question jurisdiction.

6.      Venue and personal jurisdiction is proper in this court because the defendant is headquartered in the Northern District of California.

## III: FACTS OF THE CASE

7.      The following facts are necessary to understand the case.

### III-1: Copyrighted Works

8.      The following two copyrighted works are at issue in this case:

#### III-1-A: May 16, 2021 livestream

9.      On May 16, 2021, I did a live stream on Twitch, which I later transferred to Youtube, known as "Acerthorn's Credibility as a Reviewer (w/ Montyspa on Co-Commentary)." As of the time of this writing, this video can be found at the url of https://www.youtube.com/watch?v=iDKSx4oi-r0.

10.     This livestream was streamed manually (not auotmatically) by me, using the software known as "OBS Studio." My debate partner and I planned this debate weeks in advance. It was an intentional ad planned out stream.

11.     Throughout this stream, my debate partner and I primarily exchanged opinions about a game called Dark Souls, as well as the skill with which I alleged handled feedback regarding my prior criticism of that game.

12.     At timestamp 2:17:55 – 2:18:23, you can see me giving a smug smile while I put my fingers together in a very smug manner. It is a long video, so to keep you from having to

navigate to the timestamp manually, you can click on this link to take you to that timestamp directly: https://youtu.be/iDKSx4oi-r0?t=8275.

13.     This was an intentional facial expression. In fact, at timestamp 2:18:09 – 2:18:23, I say dialogue that clearly indicates that I intended to make this expression.

14.     On January 17, 2022, I registered the copyright for this stream with the Copyright Office. Its copyright registration number is PA0002340792.

III-1-B: April 18, 2021 livestream

15.     On April 18, 2021, I did a collaborative livestream with Karl Polano on Twitch. Polano and I are co-authors of this stream, meaning that, while Polano may distribute this, and grant other people permission to distribute this, without my permission, if he does so, I am entitled to 50% of the revenue incurred from said distribution.

16.     This stream has minimal creativity because I repeatedly cracked jokes, made wisecracks, and displayed my personality and charisma for the audience's entertainment. I do not wish to share the video publicly at this point in time, and a url linking the Court to the video - even an unlisted video - would only enable others to see it, which I do not wish to do. However, the Court can still see a fair and accurate representationn of the kind of jokes, wisecracks, and personality that was on display in this stream, simply by turning to other streams of mine. The Court can see representative examples of this kind of creativity by going to my "Acerthorn Moments" playlist, which it can find here: https://www.youtube.com/playlist?list=PLpL3n7W6QqgDGty20sBgzGGYvMZWg-7Uf

17.     As you can see, these moments – which are highly similar to the personality I showed in the April 18, 2021 livestream – are absolutely creative and highly expressive. When I get around to showing the stream to this Court under seal, I have no doubt that the Court will agree with me that my personality and expressiveness in that stream is on par with what you can see in that publicly-available playlist. Therefore, the April 18 stream has plenty of creativity and originality to it.

18.     I registered this stream with USCO on September 14, 2021, and registration was subsequently granted. The registration number is PA0002315628.

19.     This stream was a joint work between me and Karl Polano. As such, Polano has the power to re-upload this stream, and grant permission to others to do so, without my permission. However, there are nuances to this law. His right to spread the stream is not unconditional. One of the most important rights I have under the law of joint works is that I am entitled to 50% of the revenue gained from said distribution.

20.     Polano shared this clip, at least in part, in order to drive viewers to his Twitch channel and boost his own revenues therein, so this counts as a commercial exploitation of the clip. Even if that wasn't directly on Polano's mind (which is most likely was), it was still at least an ancillary benefit and therefore still counts as a commercial activity. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1152 (9th Cir. 1986) ("Falwell contends … that the appeal for money was ancillary … The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit"). As long as Polano received at least one extra view on his Twitch channel, resulting in a single ad impression, that he would not have gotten were it not for the sympathy he obtained from his smear campaign against me, then he "profited" from sharing that clip, and even in the one-in-a-million chance that didn't happen, as long as it had a reasonable chance of happening, he still "stood to profit" from it. Therefore, I am entitled to 50% of the revenues he obtained from said channel growth, and as you can probably guess, neither Polano, nor any of the defendants in this case (corporate or individual defendants alike) had any intention of paying me one thin dime for this. Their goal was to *ruin my life*, not to help me while also mutually benefiting themselves like a partnership.

### III-1-C: June 25, 2022 Livestream

21.     In early June of 2022, another Youtuber and I agreed to do a livestream debate together on my Twitch channel. This other Youtuber goes by the alias "Vacant," and I do not know his real name. He agreed in writing that he would not be a co-author of the livestream, and even if he hadn't agreed to that, he still did not participate in affixing the stream into any tangible medium of expression, which is necessary to be considered a co-author. See Garcia v. Google, Inc., 786 F. 3d 733, 744-45 (9th Cir. 2015) (citing Community for Creative Non-Violence v. Reid, 490 US 730, 737 (1989)). Therefore, I am the sole author and sole copyright holder of this stream.

22.     Vacant and I had the debate stream on June 25, 2022 as planned. After the debate ended, I transferred the video to my Youtube channel, but I restricted viewing of that video to those who paid my channel at least $1 per month. Were it not for this paywall, the video could be viewed at the following url: https://youtu.be/u4lf3e5zYxs.

23.     I registered that stream with the US Copyright Office. It is now registered with the registration number as PA0002364261, with June 29, 2022 as the effective date of registration. This was registered well within three months of publication, so I am eligible for statutory damages in this case.

### III-1-D: Two of these works are unpublished

24.     This next one is going to be highly controversial, but please hear me out.

25.     It is actually not an open and shut case that these works should qualify as "published." According to 17 USC § 101, "publication" is legally defined as …

> "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication."

26.     Notice that last sentence: Simply displaying or performing a work is not publication by itself!

27.     Naturally, the Internet has thrown a monkey wrench into this definition. The invention of the Internet has introduced countless complications into the law, and this is only one of many instances of such. To help resolve this ambiguity, the Copyright Office has provided "Circular 66,"[2] which you can read here: https://www.copyright.gov/circs/circ66.pdf, addressing the issue of whether, and when, posting something online counts as publication. In pertinent part, it says …

> "The key element of publication for an online work is that the copyright owner must authorize distribution. ***Just because an end user can technically reproduce a work does not necessarily mean that the work has been published.*** A copyright owner must have expressly or implicitly authorized users to make ***retainable***

---

2   Which this Court must defer to, pursuant to the Supreme Court case of Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984).

**_copies_** of a work by downloading, printing, or other means for the work to be considered published.

The concepts of authorization and publication can be complicated and may have serious consequences for the author or copyright owner. For this reason, **_the Office generally lets the applicant decide whether a particular work is published or unpublished._** In making this determination, you may wish to consider the following general guidelines.

•       Work made available only by streaming. **_Streaming is a performance, which, in and of itself, does not constitute publication_**, because, as a practical matter, **_the end user does not retain a copy of the work when the performance ends._**

•       Work for which downloading or reproduction is expressly prohibited. **_If there is a notice on a website in the terms of service for the site or another obvious place indicating that a work or the content on the site cannot be downloaded, printed, or copied, the work or content may be deemed unpublished_**, because the end user is not authorized to download, print, or otherwise distribute copies." See pp. 4-5.

28.     Emphasis added in a few key areas. They go on to discuss a few other factors, but none of them are even arguably applicable here.

29.     Applying these rules to the instant case, two of the three streams are legally eligible to be considered "unpublished." Only the third stream – the June 25, 2022 Livestream – is legally "published," since I have gated that stream behind a paywall. However, neither the May 16, 2021 livestream nor the April 18, 2021 livestream have been so gated. Therefore, they are merely "performed" on my YouTube channel, not licsensed or sold.

30.     YouTube expressly forbids downloading any videos off of their site except through the methods they themselves provide. See https://www.youtube.com/t/terms:

"The following restrictions apply to your use of the Service. You are not allowed to:

1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders"

31.     So that is another point in favor of them being "unpublished."

32.     Nor have I hosted any of these streams (including the June 25, 2022 Livestream) on any other services besides Twitch or YouTube, so there is no way I posted it to any website which explicitly authorizes third party downloading.

33.     The closest you could get to having these streams be considered "published" is by pointing out that YouTube allows members of its "YouTube Premium" service to download videos for offline viewing. See https://www.youtube.com/premium ("Downloads Save videos for when you really need them – like when you're on a plane or commuting"). However, that still doesn't count. These so-called "downloads" are only viewable within the YouTube mobile app and (most importantly of all) are automatically deleted after a few days, because they aren't meant as a substitute for downloading of videos to get around copyright. It means to for commuters and such, who are only without Internet for a few hours, or 1-2 days at most.

34.     In other words, the existence of YouTube Premium's download feature does not constitute publication of YouTube videos, because the videos downloaded using that feature are not *retainable*. As shown above, that was an essential element in whether or not posting something on a website constitutes publication.

35.     The only way you can download videos off of YouTube in a way that is both retainable, and expressly authorized by the service, is if you were logged into the channel's account and download them from your YouTube Analytics page. Since John Doe obviously cannot claim to have gotten any of my videos using that method, the videos are therefore legally classified as "unpublished" for purposes of this case.

<u>III-1-E: I am not "changing the facts."</u>

36.     By now insisting that these works are unpublished, the Defendants are sure to insist that I am "trying to change the facts," just like Google LLC (represented by the same legal counsel as in this case) did in Case 4:21-cv-04184-JSW (Stebbins v. Polano), Dkt. 151, p. 5, lines 17-19 ("Plaintiff asks for leave to amend not to clarify his allegations or provide added detail, but to *change the facts* concerning how the Accidental Livestream was created") (emphasis in original). That is not what I am doing.

37.     First of all, I never stated in the original complaint that the May 16[3] stream was published, but even barring that, we must remember that whether or not a work has been "published" is not a purely factual matter, but a mixed question of fact and law. Whether I have gated the streams behind a paywall, and whether I, or any of the websites I have posted the streams on, have authorized third parties to download offline, retainable copies of these streams (and again: They must be "retainable," otherwise it doesn't count) are purely factual matters, but they are not the least bit in dispute, and I never tried to dispute them.

38.     The only thing that has happened since then is my realization that streaming on Twitch and posting on YouTube did not constitute publication *as a matter if law*. This is a purely legal argument, not a factual one. Therefore, I am well within my rights to change my overall stance on the issue of publication status in light of this new finding.

### III-2: Infringements

39.     The following infringements of the aforementioned copyrights occurred that are now relevant tot his case.

<u>III-2-A: Infringement #1: ATTA's Channel Icon</u>

40.     John Doe created a YouTube channel called "Acerthorn the True Acerthorn,"which was dedicated to harassing me, doxxing me, impersonating me (as evidenced by the channel's name), and infringing on my copyright. This channel has posted several videos which infringe on my copyright. Many of these videos are unregistered, which is the main reason I am not filing a claim for them at this moment. However, the channel icon (a circular image that appears next to the channel's name) is clearly a snapshot of the "smug face" mentioned above.

41.     Although the channel was originally created on February 29, 2020, it was not always called "Acerthorn the True Acerthorn." Instead, the owner of this channel changed the name of the channel after deciding to make a hobby out of harassing and impersonating me. It was at this point that he began using the screenshot from my copyrighted livestream. As you can see by viewing the channel, the oldest of his videos was posted on April 10, 2022. It is, therefore, highly likely that his uploading of the infringing icon also occurred on or shortly before this date.

---

3   The original complaint doesn't mention the other two streams at all, so I can't have "locked myself into" any
    factual assertions thereof.

42.     Because the uploading of his icon most likely occurred approximately 83 days after the livestream was registered, the preponderance of the evidence overwhelmingly suggests that the registration predates the infringement, thereby entitling me to statutory damages.

43.     But even in the already unlikely event that his adoption of the icon predates the registration, I am still entitled to statutory damages because, as I've already explained, the stream is (and remains to this very day) officially unpublished. This means that I could register the copyright *whenever I want*, and it would still be registered "within three months after the first publication of the work" as set forth in 17 USC § 412(2)! So no matter how you cut it, I am eligible for statutory damages and there's no two ways about it.

44.     In any event, on August 3, 2022, I issued a DMCA Takedown Notice to Youtube, asking them to remove the infringing icon.

45.     In the early morning of August 4, 2022, I received a response from Youtube, informing me that Google is actually the company that hosts channel icons on Youtube's behalf, so if I want an infringing icon to be removed, I have to go through Google.

46.     So I searched the database on copyright.gov and found Google's DMCA Designated Agent. I found the following listing: https://dmca.copyright.gov/osp/publish/history.html?search=Google+LLC&id=18b733849581703204a3229ddd03c10b. That listing said that the email address for Google's Designated Agent was dmca-agent@google.com.

47.     So I submitted a DMCA Takedown Notice to that email address on August 4, 2022. This takedown notice was fully compliant with the DMCA's requirements for a takedown notice.

48.     However, later that same day, Google responded to the DMCA Takedown Notice, stating that they were not going to process the takedown until I provided "additional information." They never stated exactly what information they wanted me to provide, and even if they did specify.

49.     Therefore, Google LLC has lost its safe harbor in this case and has become jointly liable for the icon's infringement.

            III-2-B: Infringements #2: Uploading of clips of April 14, 2022 livestream

50.     On April 10, 2023, John Doe published two clips from the April 14, 2022 livestream. These clips were entirely unaltered, and contained no original commentary, criticism, or even

any original content whatsoever. They were just verbatim, unaltered clips.

51.     If John Doe hadn't deleted his channel, the infringing video could be found at the url of http://www.youtube.com/watch?v=I0bzpF6A08E.

52.     On April 10, 2022, I issued a DMCA Takedown Notice to YouTube, asking them to remove the videos mentioned in Section III-2-B above (the uploading of clips of the April 14 livestream). On April 12, 2022, I received an email from YouTube stating that they would not take down the videos. These videos remained up for nearly a year, until John Doe deleted his entire channel in January 2023, as mentioned above. Therefore, YouTube LLC has lost its safe harbor and is jointly liable for this infringement.

 III-2-C: Infringement #3: Uploading the entirety of the June 25, 2022 livestream

53.      On Dec 11, 2022, John Doe uploaded the entirety of my June 25, 2022 livestream to his ATTA YouTube channel. Just like with the April 14 livestream, there were no modifications or alterations whatsoever to the stream, let alone any transformative ones.

54.     I immediately issued a DMCA Takedown Notice to YouTube, and the video was taken down a short time thereafter. This is the only count of infringement in which the corporate defendants have safe harbor.

55.     While the DMCA Takedown was being processed, I created a throwaway YouTube account under the alias "Isaak the Evil Dentist"[4] and asked John Doe how he acquired the video when it was supposed to be paywalled. He replied, admitting to precisely what I suspected: He got it from an Internet user who goes by the alias ZellZander, who had posted the stream on the website of KiwiFarms. I am currently suing this individual (whose real name is Jarrod Jones) in Case 3:22-cv-04082-AGT (Stebbins v. CMDRImperialSalt). But for the purposes of this case, John Doe had, intentionally and maliciously, uploaded the stream, in its entirety and without alteration, to YouTube, which constitutes a separate act of infringement.

**III-3: Doe's bad faith and malice**

56.     It cannot be stressed enough: The ENTIRE point of John Doe created the ATTA YouTube

---

4    a reference to professional wrestler Glenn Jacobs, most famous for his character "Kane" in WWE, who had previously wrestled under the alias "Dr. Isaac Yankem," who was an evil dentist, a character inspired by Orin Scrivello from Little Shop of Horrors.

channel was to harass me, dox me, impersonate me, and infringe on my copyright! This was not merely the primary goal, but the ONLY goal. His goal was never to provide any actual criticism of me or my content, but only to harass me and provide a safe haven for others to harass and dox me without getting blocked by me. Nothing more, nothing less.

57.    This is best evidenced by the video library on that channel. The vast majority of videos on that channel, before John Doe deleted the channel in shame, were merely verbatim re-uploads of my own videos, with no alterations or modifications whatsoever. See Sections III-2-B and III-2-C of this Complaint as prime examples. His intentions with the channel were never to provide any legitimate transformative value, only to hinder my ability to make money from my own content by posting it himself in order to drive views away from my channel.

58.    This is going to come into play whenever we discuss fair use in Section IV-4 and IV-5, for multiple reasons (some less obvious than others).

## IV: LEGAL ARGUMENTS

59.    The following law is applicable to my case:

### IV-1: Prima Facie Copyright Infringement

60.    "There are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1151 (9th Cir. 1986).

61.    For all three livestreams, I have sufficiently demonstrated that I own the copyright (or at least half the copyright) to all three. Sections III-1-A, III-1-B, and III-1-C all allege sufficient facts to show that I own copyright for all three works. Therefore, the first essential element of copyright infringement is sufficiently plead.

62.    Sections III-2-A, III-2-B, and III-2-C of this Complaint sufficiently allege copying by John Doe for all three counts of infringement.

63.    ¶¶ 44-48 of this Complaint sufficiently allege that Google LLC is jointly liable for Infringement #1. Meanwhile, ¶ 52 of this Complaint sufficiently alleges that YouTube LLC is jointly liable for Infringement #2.

64.    Therefore, prima facie copyright infringement has been sufficiently plead for all three

counts of infringement.

### IV-2: Joint Works

65.     For Infringement #2, the original work was a joint work. Therefore, John Doe may plead that he got permission from Karl Polano (co-author to that stream) to post the clip on YouTube.

66.     First of all, John Doe would have to make an appearance in the case and affirmatively plead that before the Court is required to consider it. As such, we should proceed on the presumption that he did not have Polano's permission to upload until John Doe explicitly raises that defense. Even then, in order to prove this, he would have to call Polano as a witness and have him testify, and for what it's worth, Polano lives in Switzerland, which means the the defendants (both Doe and YouTube) will have to go through the Hague Convention to subpoena him!

67.     But even barring that, there are nuances to this law. His right to spread the stream is not unconditional. One of the most important rights I have under the law of joint works is that I am entitled to 50% of the revenue gained from said distribution.

68.     Polano shared this clip, at least in part, in order to drive viewers to his Twitch channel and boost his own revenues therein, so this counts as a commercial exploitation of the clip. Even if that wasn't directly on Polano's mind (which is most likely was), it was still at least an ancillary benefit and therefore still counts as a commercial activity. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1152 (9th Cir. 1986) ("Falwell contends … that the appeal for money was ancillary … The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit"). As long as Polano received at least one extra view on his Twitch channel, resulting in a single ad impression, that he would not have gotten were it not for the sympathy he obtained from his smear campaign against me, then he "profited" from sharing that clip, and even in the one-in-a-million chance that didn't happen, as long as it had a reasonable chance of happening, he still "stood to profit" from it. Therefore, I am entitled to 50% of the revenues he obtained from said channel growth, and as you can probably guess, neither Polano, nor any of the defendants in this case (corporate or individual defendants alike) had any intention of paying me one thin dime for this. Their goal

was to ruin my life, not to help me while also mutually benefiting themselves like a partnership.

69.     Therefore, even in the already unlikely case they manage to subpoena Polano using the Hague Convention and he testifies that he did indeed authorize this re-upload, it still does not save the Defendants as a matter of law. They are still liable for Infringement #2.

### IV-4: Fair Use

70.     Fair use is always something one must consider whenever you're dealing with the infringement of copyright, especially for antagonistic purposes. For this reason, I wish to explain why I believe the infringing icon does not qualify as fair use.

<u>IV-4-A: Only Infringement #1 is eligible to even raise the defense of fair use</u>

71.     First, only Infringement #1 has any claim to fair use that can even arguably be raised. The other two counts of infringement amount to nothing more than verbatim re-uploads of my videos (or at least clips thereof) with no alterations or modifications whatsoever, much less transformative ones. There is no case that can even arguably be made for fair use there.

72.     As such, I will only be focusing on John Doe's channel icon when I discuss fair use.

<u>IV-4-B: Factor #1: Purpose and Character</u>

73.     First, the icon itself fails to offer anything of transformative value. Admittedly, there are additions to this image. There appear to be subtitles that contain the words "Acerthorn" and "laws," but parts of those words have been cropped out, so we have no way of knowing what the original message was. Also, on the left side, you can see part of another man's face.

74.     It is clear that this icon was not an original creation, but was instead cropped out from a pre-existing meme. It is possible that the original meme might have passed for fair use, but without having the full meme in front of us, we have no way of knowing.

75.     But even if the original meme was fair use, this icon still isn't. If you remove everything from a meme that makes it transformative, you lose the right to call the resulting crop transformative in turn. Imagine if I upload a movie clip to Youtube, and I claim that I got the clip from a review of that movie of that movie that I found online. Because that review was fair use, I can use the clip from the movie and have it still be fair use, right?

76.     Not right. That's not how it works. If you remove all the transformative content, you lose

the right to claim it is transformative.

77.     Here, John Doe cropped out most of the stuff that could, conceivably, have rendered the meme transformative. What we are left with is a mish-mash of nebulous "stuff" simply slapped onto my face. That is not good enough to be considered fair use. "[T]he addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative." See Seuss v. Comicmix, , 983 F. 3d 443, 453 (9th Cir. 2020).

78.     In their Motion to Dismiss the original Complaint, the Defendants insist that the words "Acerthorn Laws" constitute "obvious" and "unmistakable" criticism. Specifically, they claim that it is a reference to my litigious past. This argument, however, falls flat. Unless you already know exactly what it's meant to say, no reasonable person could ever be expected to figure out, from these two words alone, what the icon is referring to.

79.     To show you what I mean, let's use this similar meme as an example:



80.     This is, basically, the same thing that John Doe used for his channel icon. It is a famous person's smiling face, with that person's name, followed by the word "laws," both written at the bottom.

81.     And yet, I highly doubt anyone would seriously argue that this meme is "transformative." The only thing this meme tells us about this person is that she is affiliated with the law in some capacity. The two words "Judy laws" fails to actually say anything specific about her, e.g. whether her stances on the law were good or bad, whether her judgments were just or unjust, whether she was strict or lenient in their judgments, etc. As such, there is no actual criticism or commentary about this woman. Therefore, this meme is not transformative as defined by fair use law.

82.    If you want an example of criticism of this woman that has a much stronger case for being considered "highly transformative," watch this video: https://youtu.be/eCgZCcvOBvs. This is a much stronger case for being considered "highly transformative," because this time around, the criticism and commentary truly is "obvious" and "unmistakeable," rather than relying on insider knowledge in order for its audience to "get the joke."

83.    As you can see from that example, John Doe's attempt at "criticism" simply by using the words "Acerthorn Laws" is an absolutely pathetic case for transformative value.

<u>IV-4-C: The Channel as a Whole</u>

84.    While the icon may not qualify as transformative all on its own, it may not have to, as long as it is considered part of an otherwise fair use whole. For example, if a Youtube channel is dedicated to covering Star Wars content, then that channel might legally get away with using an otherwise non-transformative picture of Darth Vader as its channel icon. However, in order to get fair use for the icon, the channel itself must be, at least majority, dedicated to fair use content, e.g. movie reviews, story analysis, fan theories, stuff like that. It cannot simply be a repository for otherwise unaltered movie clips. With that said, let's look at the videos that ATTA has posted.

85.    First, there's the uploading of the April 18, 2021 and June 25, 2022 livestreams, both of which are also counts of infringement in this case. They contained absolutely alterations or modifications whatsoever, let alone transformative ones.

86.    There was also another clip from the April 18, 2021 livestream that John Doe had uploaded, also without alteration. I am not filing suit over it at the moment because (A) it has already been deleted anyway, and (B) the statutory damages I can recover for it are redundant of those I can recover pursuant to Infringement #2. However, it still contributes to the overall video library and demonstrates the complete lack of transformative value contained therein.

87.    Another video (titled "Acerthorn Eats a Fly") was also an entirely unaltered clip, with no new expression (transformative or otherwise) added in.

88.    The video "Acerthorn is a doxxer and here's why" is even worse: It is literally just a verbatim upload of an entire video. It isn't even a clip; it's literally the whole video. The same is also true of the two aforementioned videos that have been taken down. Both of them were

verbatim reuploads of entire videos. John Doe did not make even the slightest attempt at anything remotely resembling transformative value.

89.     There was also another video. This was a verbatim re-upload of my YouTube video "Please help me report this doxxer." On December 11, 2022, John Doe posted the *entire video*, with no alterations or modifications whatsoever, at the same time he posted my June 25, 2022 stream. Just like with that stream, the video was taken down by YouTube. These are the *only* two videos that were taken down pursuant to my DMCA Takedown Notices, rather than when John Doe deleted his channel of his own accord in January 2023.

90.     Another example is the video titled "Acerthorn Theme Song." While the audio of that video was not copyrighted by me (it was instead copyrighted by a musician who goes by the stage name "Nihilore," from whom I have received permission to use his song as my channel's theme song), the visuals were indeed copyrighted by me. This video was a slideshow of facial expressions from my videos and streams, with Nihilore's music playing in the background. Only a few of the images in this slideshow, however, can even nominally be described as "transformative." The majority of the images of this slideshow consist of nothing more than me sitting in front of the computer and making various faces. Sometimes I am wearing my signature blue shirt and ball cap; other times (such as in the very beginning) I am wearing other clothes. But only a few of these images had made any modifications whatsoever, let alone transformative modifications. I downloaded a copy of this video and can present it as evidence when the case gets to discovery.

91.     That alone means that seven out of eleven videos (aka a majority of them) cannot qualify for fair use. So there is no need to discuss the remaining four videos.

92.     It is clear, at this point, that John Doe is not actually concerned with fair use. Any nominal transformative value that ends up on his channel is entirely incidental. It is clear that he is not curating his content based on what is fair use. Therefore, his channel cannot be classified as a "fair use channel."

93.     In their Motion to Dismiss the original Complaint, Google argues that we should not focus on the video library to determine whether the channel as a whole should be considered a

"fair use channel." To that end, they point to the channel art (which I admittedly made reference to in the original complaint), the "about" section, and the section of related channels, titled "Acerthorn's Archnemises," in support of their claim that the channel as a whole should be considered a "fair use channel," thereby entitling the channel icon to second-hand fair use status.

94.     However, this argument is, to put it mildly, laughable. First, I dispute that these other elements are transformative. Second, even if they are transformative, for the reasons set forth below, I believe that this is not a material fact worth considering, and therefore should not preclude partial summary judgment on this defense.

95.     The reason I believe it is not material is simple: When it comes to a YouTube channel, the video library is, hands down, the most important element of said channel, to the point where literally all other elements are 99% inapposite to determining the channel's overall status in the eyes of the law. Nobody goes to a YouTube channel just to read its "About" page, or to check out the channel artwork. People subscribe to YouTube channels for their video content.

96.     Moreover, the videos are the primary means through which viewers discover new channels to subscribe to. Whether it be on the home page, the shorts feed, search results, or the "suggested videos" column found on the right side of every YouTube watch page, the first thing you see as you browse YouTube is a selection of videos that are recommended for you to watch. These videos serve as new viewers' first point of contact for new YouTube channels, and only by being impressed by the first video do the vast majority of YouTube viewers navigate to the channel itself.

97.     Even when they navigate to the channel itself, they are primarily doing so in order to find more videos to watch, not to check out any of the channel's other elements. The closest you can get to a secondary element that most viewers are interested in are playlists, but even they are just there to facilitate watching more videos.

98.     Almost nobody ever goes to or takes any interest in a YouTube channel for anything other than the video library. The other elements of a channel are so incidental that, at best, they could serve as a tie-breaker if it was a toss-up whether the video library could be considered fair use. If the Court was not comfortable making a call on the video library's overall status, it might turn to

other channel elements to help make its determination. But the other elements cannot save an otherwise clear-cut case of unfair use and bring it into the realm of fair use.

99.　　To help illustrate what I mean, let's take a hypothetical example involving books: Imagine if there was a book, written by X author, who is suing some defendant for reprinting his book for profit. In this hypothetical scenario, most of the elements of the infringing book were slightly modified. The cover art on the front, the blurp on the back, the "About the Author" page, the dedications page, even the chapter titles, were all slightly modified in order to make them arguably parodic. But the story itself – the part that most people typically read whenever they "read a book" – consisted solely of the infringer directly copying and pasting the entirety of the plaintiff's story, word for word, from his original book. The Defendant in that case argues that, because the other elements of the book were transformative, that means the book as a whole should be considered a "fair use book."

100.　　If such a case were to ever come before this Court, this Court would undeniably throw the book at the defendant. Even if the other elements of the book were fair use (and even that would have to be litigated), that doesn't matter. The story is the most important part of any book, and so that is what must be transformative in order for the book as a whole to be considered a "fair use book."

101.　　This example clearly demonstrates that there is only one conclusion of law the Court can reasonably reach in this case: In order to be considered a "fair use channel," the videos, not any of the other channel elements, are what need to be majority fair use. Since, by the defendant's own admission, that is not the case here, the Court should summarily judge the channel as not being a "fair use channel," foreclosing the Defendant's hopes of obtaining secondhand fair use.

102.　　But even barring all of that, it still ultimately doesn't matter. Even if we accept that the other channel elements should be considered, it still doesn't save the defendants here. The only way the Defendants could possibly claim the channel as a whole is a "fair use channel" is if (A) the channel art, about tab, and archnemesis sections *should* be considered, and (B) the video library *shouldn't* be considered!

103.　　This is important because, as I demonstrated above, the video library is absolutely

indefensible as a matter of fair use. If it is to be considered when weighing the channel as a whole, it should entirely engulf the other channel elements in terms of overall transformative value, like a rubber duckie caught in a tsunami. The only way the Defendants can possibly make a case for the channel as a whole being a "fair use channel" is if the video library is not considered at all.

104.    The Defendants have offered no argument whatsoever, let alone a compelling argument, as to why the video library shouldn't be considered. Only by sweeping the issue under the rug can the Defendants make their case seem like anything short of a blatantly frivolous argument.

105.    Therefore, no matter how slice it, the channel as a whole cannot be considered a "fair use channel." This means that the icon itself must qualify as transformative all on its own, which it absolutely cannot do.

106.    Losing this factor is crippling to the Defendant's overall hopes of obtaining fair use. "[I]f the commentary has no critical bearing on the substance or style of the original composition the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 453 (9th Cir. 2020) (citing Campbell v. Acuff-Rose Music, Inc., 510 US 569, 580 (1994)).

107.    Speaking of its commerciality, that leads us to …

IV-4-D: Commerciality

108.    In addition to this, it must be understood that the use of the icon was commercial. While it is unproven that John Doe never received any money from the icon (and that has yet to be proven), Google LLC – who is jointly liable for Infringement #1 – is undeniably a commercial, for profit entity.

109.    In arguing for the dismissal of the original Complaint, the Defendants insist – without providing any legal citation (because none exist) – that John Doe's actions must, themselves, be commercial in nature in order for this factor to weigh against fair use. This is not true. A use is considered "commercial" even if third parties benefit monetarily from the use. See https://www.insidehighered.com/views/2011/08/02/myths-about-fair-use:

"**Myth #3: Fair use is easy for an academic — I can take whatever I want because everything I do is noncommercial.**

**Reality:** Working noncommercially does give you some privileges, but you'll be stuck in a gray zone if you depend on that to justify fair use. You won't be able to circulate your work in academic journals (they carry ads) or books (even nonprofit publishing houses sell their books). Even when you contribute for free to online sites, somebody's conducting commercial activity — perhaps an advertiser placing ads on a site, or a data miner.

110.     As you can clearly see, in order to get the "noncommercial" distinction to weigh in favor of fair use, the use in question must remain noncommercial throughout the *entire distribution process*. If anyone, anywhere down the line, profits directly or indirectly, the use is considered "commercial" for purposes of fair use.

111.     Therefore, this factor also weighs against fair use.

<u>IV-4-E: Factor #2: Nature of Copyrighted Work</u>

112.     First, the May 16 stream is officially unpublished. See Section III-1-D of this Complaint for more details. This alone causes the second factor to weigh against fair use. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1178 (9th Cir. 2012) (finding that the "unpublished" sub-factor outweighs the "minimally creative" sub-factor).

113.     But even barring that, the May 16 stream was still creative. It mostly consisted of me and my debate partner exchanging opinions on the video game "Dark Souls." This weighs against fair use the same as works of fiction do. See Cambridge University Press v. Patton, 769 F. 3d 1232, 1270 (11th Cir. 2014) ("[W]e find that the District Court erred in holding that the second factor favored fair use … Where the excerpts of Plaintiffs' works contained evaluative, analytical, or subjectively descriptive material … or derives from the author's experiences or opinions, the District Court should have held that the second factor … weighed against fair use in cases of excerpts that were dominated by such material"). See also Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539, 563-64 (1985) (finding the second factor to weigh against fair use in part because "The Nation ... excerpted subjective descriptions and portraits of public figures whose power lies in the author's individualized expression").

114.     But even barring that, it is important to understand that it was not any of the opinions

expressed in that stream, but a highly expressive facial expression, that John Doe actually used for his channel icon. This is important because it is the portion that the defendant copied, not the overall work, that determines whether the second factor favors fair use. As Harper & Row above clearly demonstrates, the subjective nature of the author's individualized expression mattered in the first place primarily because *that's what the Nation copied*!

115.    See also Cambridge, supra at 1270 ("Defendants argue that GSU professors chose the excerpts of Plaintiffs' works for their factual content, not for any expressive content the works may contain"). The implication, here, is clearly that, had that been what the Defendant had actually copied, it might have caused the second factor to weigh in favor of fair use.

116.    Applying this law to the instant case, it is clear that the channel icon took a highly expressive portion of the stream (assuming the opinions themselves were not "highly expressive" in and of themselves). He took a screenshot of my "smug face" from that video. It is obvious that he chose that screenshot primarily because of how ***expressive*** that face was!

117.    Therefore, no matter how you slice it, the second factor weighs against fair use. Period.

<u>IV-4-F: Factor #3: Amount & Substantiality</u>

118.    Although only one frame of the video is taken, there is a very high possibility that John Doe took the "heart" of the work.

119.    All a specific part of a work needs, in order to be considered the "heart," is to be the "most memorable aspect" of the work. See https://fairuse.stanford.edu/overview/fair-use/four-factors/. That can come about in an infinite number of ways.

120.    More importantly, it is the audience, not the author, that determines which part of a work is the "most memorable aspect" part. For example, here is a moment from the professional wrestling even called "The Greatest Royal Rumble" that is generally considered by the fanbase to be the most memorable part of the entire show: https://youtu.be/JUJfDF6yg04

121.    Obviously, WWE did not produce that show with the intention of that moment being the most memorable part of the show, owing to the simple and obvious fact that they never "intended" for that moment to happen at all. But that doesn't matter. It ended up that way, and therefore, that moment is the "heart" of the work, not because WWE says so, but because the

fans say so.

122.    In the instant case, there are many opinions expressed during that video, but the fact that there are so many of them means that they all blend together. Much more so than any opinion stated in that video, this facial expression appears to have transcended the actual discussions of that video and become the most popular and memorable aspect in the video. Even if that wasn't my intention when I scheduled to do the video with Montyspa, that's how it turned out. Therefore, that facial expression is still the "heart" of the work.

<u>IV-4-G: Factor #4: Effect on the Market</u>

123.    "This last factor is undoubtedly the single most important element of fair use." See De Fontbrune v. Wofsy, 39 F. 4th 1214, 1226 (9th Cir. 2022) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)). Moreover, it is the one factor that has been expressly affirmed by the Supreme Court as being singularly capable of negating fair use in its entirety, all on its own. "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." See Monge, supra at 1182 (emphasis in original). "If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair." Harper & Row at 568.

124.    It is also important to note that the defendants necessarily hold the burden of proof on this issue. See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 458-60 (9th Cir. 2020), which unequivocally calls upon the defendant, "as the proponent of the affirmative defense of fair use," to "bring forward favorable evidence about relevant markets," and stating that this is one of the few "absolute statements" when it comes to fair use.

125.    I am not required to allege market harm in the Complaint. See Peterman v. Republican National Committee, 320 F. Supp. 3d 1151, 1157 (MT 2018) ("[I]t is not necessary to plead facts that disprove fair use to survive a Rule 12(b)(6) motion to dismiss"). The fact that I am offering to make a token argument here is a courtesy, not a requirement.

126.    That being said, this icon intrudes on my derivative rights. As the copyright holder, I have the right to control derivatives of my copyrighted works. YouTube channel icons, as well as similar circular icons for other websites, are undeniably one such derivative market. I have the

right to charge a royalty from anyone who wishes to use any of my copyrighted content as their channel icon, even if the icon is only meant for personal, noncommercial use.

127.     Since John Doe, obviously, did not pay me a royalty that I agreed to (nor did he even attempt to reach out to me to discuss the prospect), that means my derivative rights have been infringed upon.

<u>IV-4-H: Wrapping up the Four Factors Test</u>

128.     In conclusion, there is not a single factor that weighs in favor of fair use. At the very least, there are enough arguable facts in my favor that we cannot safely dispose of Infringement #1 at the pleading stage. We will have to conduct discovery to know for sure.

**IV-5: Harassment is *never* fair use.**

129.      Even if, in spite of all of this, the Court still insists that Infringement #1 is fair use, as I alleged earlier, John Doe acted solely out of a desire to harass and dox me, not to criticize me. This should singlehandedly kill the Defendants' claim of fair use to the exclusion of all other factors, for two reasons:

<u>IV-5-A: Unclean Hands</u>

130.     This means that he has acted with unclean hands, which should serve as a counter-defense to fair use.

131.     When passing the 1976 statute that is the current applicable Copyright Law, "The House Report expressly stated that the fair use doctrine is an 'equitable rule of reason.'" See Sony Corp. of America v. Universal City Studios, Inc., 464 US 417, 448 n. 31 (1984). "From this … it would follow that unclean hands and all other equitable considerations are pertinent." See Leval, P. (1990). Toward a Fair Use Standard. Harvard Law Review, 103(5), 1105. doi: 10.2307/1341457.

132.     Leval would go onto admonish the judiciary for assuming that fair use is quitable, and explain how the history of fair use shows that it originated in law, not chancery. But guess what: That doesn't matter! Even if it was erroneous for the judiciary to slowly gravitate towards seeing fair use as an equitable rule, it doesn't matter what the courts of the 19th and early 20th centuries thought. As of the Copyright Act of 1976 (the current one), fair use's status as an equitable rule is, for better or worse, codified by Congress. Don't like it? Too bad. That's the law. Says who?

Says Congress!

133.    And since fair use is now codified in law as being equitable, that means unclean hands is an exception to it. If anything, there needs to be a positive law stating that unclean hands isn't an exception to fair use, not a positive law stating that it is an exception, because the fact that fair use is equitable is all we need for unclean hands to necessarily be part of the package.

134.    In Google v. Oracle, 141 S. Ct. 1183 (2021), the Supreme Court recited a portion of Leval's treatise when it held that "[c]opyright is not a privilege reserved for the well-behaved." See id at 1204. However, this is actually of minimal value to the instant case for a variety of reasons. First, that was only dictum; in fact, the Supreme Court explicitly said it was dictum when they said "We have no occasion here to say whether good faith is as a general matter a helpful inquiry" immediately thereafter. Second, short of declaring the law unconstitutional (which they have not done here), the Supreme Court cannot nullify the express Congressional intent[5] that fair use is meant to be an equitable rule.

135.    Third, if the Defendants insist on pushing this as binding precedent, the Court must also reject the defendants' assertion that I am just trying to silence criticism about me.

136.    What do I mean by that? Well, when the Supreme Court said that "copyright is not a privilege reserved for the well-behaved," they were reciting an excerpt from the aforementioned treatise "Toward a Fair Use Standard" by Pierre Leval. However, if you actually go and read what he wrote, you realize that he was actually going to bat for precisely the type of behavior that the Defendants have accused me of in this case: Suing for copyright infringement just to silence criticism! Rather, Leval's logic was that, if plaintiffs are allowed to do that, it's only fair that defendants get to claim fair use even when they act in bad faith. See id at 1127-28:

> "The temptation to determine fair use by reference to morality also can lead to examination of the conduct and intentions of the plaintiff copyright holder in bringing the suit. The secondary user may contend that the copyright holder is disingenuously invoking copyright remedies as a device to suppress criticism … Like a proprietor of land or an owner of contract rights, the copyright owner may sue to protect what he owns, regardless of his motivation."

---

5   The legislative intent is generally considered to be second only to the "plain meaning rule" in terms of statutory construction, and the Committee Notes are indispensable in identifying legislative intent.

137.    Therefore, according to the very logic upon which the defendants rely to make its case that their bad faith harassment and doxxing is irrelevant, they must likewise abandon the accusation that I am simply attempting to silence online criticism. According to the very precedent they defer to, either both are relevant or neither are relevant. It's only fair.

138.    If you disagree with Leval's logic entirely, then that just means we're back to square one, with fair use's status as an equitable rule being codified by Congress without any authority to contradict that.

139.    But one thing the defendants absolutely should not be allowed to argue is that the good faith requirement is only a one-way street, that plaintiffs have to act in good faith at all stages of the matter, but defendants do not. That would be the epitome of an unfair legal system.

140.    So no matter how you slice it, the defendants' clear bad faith and malice (as clearly evidenced by their repeated actions over the past few years) are a counter-defense to fair use.

141.    Free speech would not be chilled if the Court were to adopt a policy in my favor on this issue. Even political speech – which typically occupies the absolute highest rung of First Amendment protection – is limited whenever people knowingly and maliciously publish false statements about government officers out of pure malice and spite. See New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

142.    Those who are exercising their right to fair use in good faith would not be deterred from further exercise of their rights just because of this precedent. The only ones who would be chilled are those (like the defendants in this case) who view fair use as one of only two irreconcilable extremes: Either the mere addition of only a few words of token criticism provides total immunity from copyright law to the exclusion of all other factors, or fair use never applies to any copyright infringement, ever, under any circumstances, no in between. But aside from those extremely few (and extremely delusional) people, nobody in their right mind would look at a precedent stating that infringement done purely out of a desire to harass the target rather than criticize his work is not fair use, and think that would chill good faith criticism.

143.    For sure, Courts should be weary of borderline cases. They must be cautious to avoid labeling well-intended criticism as harassment simply due to less-than-ideal execution of said

criticism. But where, as here, it is extraordinarily clear that the defendants have no ambition beyond simply inflicting as much pain on me as humanly possible, entirely for its own sake, while hiding behind an ultra-thin layer of token "criticism" as a shield for their blatantly malicious behavior, there is no risk of a chilling effect.

144.    But even if unclean hands, as a matter of law, is inapplicable as a counter-defense to fair use, there is still a compelling public policy reason why it should apply here.

IV-5-B: This particular brand of unclean hands deserves to be a counter to fair use, more than any other type of unclean hands.

145.    Even if unclean hands, generally, is not a counter-defense to fair use, the defendants' harassment in this case should still nullify their case for fair use, for one simple reason: To apply fair use in this case would be egregiously counter productive to the very public policy that fair use exists for in the first place. "The fair use doctrine thus permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." See Campbell v. Acuff-Rose Music, Inc., 510 US 569, 577 (1994). But in this case specifically, it is the defendants' harassment, not a "rigid application" of copyright law, which stifles creativity.

146.    Criticism is often considered transformative. In fact, it is often considered quintessentially transformative. The Supreme Court has correctly acknowledged that the constitutional imperative surrounding copyright law – to "promote the science and useful arts" – is generally enriched by transformative content such as criticism and parody. See Campbell, supra at 579. I do not seek to challenge this long-established principle. But this just begs the question: Why? Why does criticism enrich the science and useful arts? How exactly does it do that?

147.    The answer to that question is obvious if you think about it for even a few minutes: When art is criticized, its strengths and weaknesses are typically brought into focus. Although the work in question cannot be changed, since it is already published, all subsequent works of art can use the feedback from the previous works and incorporate that feedback into their designs, hopefully maximizing the strengths and minimizing the weaknesses of what came before it. Once finished,

this new work will, itself, become subject to similar criticism and scrutiny, which future creators can take to heart when designing their future creations. Ideally, this "cycle of feedback" – assuming that both artists and reviewers alike participate in the cycle in good faith – should result in art becoming better and higher quality over time. This long-term benefit to the creative arts is certainly worth a short-term bruising of individual artists' egos.

148.    That, however, also paints a perfect image as to why harassment should not be considered "transformative." Whereas criticism, when done correctly, aims to improve art over time, harassment does not have that same benefit. Rather than "promoting" the science and useful arts, harassment actively suppresses it. The whole point of copyright, and the legal monopolies created by it, is to entice artists to create by luring them in with the opportunity to profit from their creations, but harassment actively undermines the incentives to create by iscouraging would-be creators from getting into the fields they'd otherwise be interested in.

149.    Many would-be harassers insist that artists "have to learn to take criticism," otherwise they simply are not cut out for the creative fields. However, there is a big difference between professional reviewers, in highly-edited and proofread reviews, published in newspapers, periodicals, and/or TV shows, pointing out a movie's shortcomings and flaws and using specific examples from the movie to illustrate their criticisms, versus a bunch of untrained, undisciplined virgins in their parents' basements with nothing but a smartphone, an extreme sense of selfentitlement, and precisely zero critical thinking skills launching vile, toxic, vulgar, line-crossing personal insults designed solely to inflict pain towards anyone they don't like, while hiding behind the anonymity of the Internet, simply because they can. The latter is not the least bit conducive to the overall goals of promoting the science and useful arts. In fact, it actively suppresses it by discouraging potential creators from creating.

150.    In order for criticism to fulfill its legal role of promoting the science and useful arts, the feedback in question has to be specific, tangible, and actionable. It has to be something that creators can actually use in future works in order to guide and direct said works. This requires that the criticism in question be offered with a healthy regard to the distinctions I mentioned in Section III-2-B. Alleged "criticisms" such as calling me deranged, saying that I'm the reason why

there are warnings on bleach not to drink it, or other vulgar insults, do not in any way, shape, or form help to improve art over time. Even relatively polite disagreements with my opinions still do not have this quality about them if they amount to little more than simply registering their disagreement with my opinion while offering nothing more. Such feedback, even if given relatively politely, fails to "add value" to the original, and therefore is not transformative.

151.    To be clear, I am not advocating that copyright law does, or should, create a positive right for creators to be absolutely free from any/all deterrence from entering the creative fields. For example, artists are not entitled to government subsidies should their art fail to turn a profit, so the threat of poverty and starvation may serve as a valid deterrent to those who may otherwise pursue artistic endeavors that may require they quit their day job in order to properly pursue. Also, the threat of being disowned by one's family is certainly a valid and lawful deterrent to entering morally controversial creative fields such as pornography. But that does not mean that plaintiffs and courts are obliged to suffer in silence when wholly malicious defendants like these are going out of their way to engage in conduct that is already illegal to begin with17, in order to actively create more deterrents to creativity than those which already occur naturally.

152.    The Defendants disagree with this argument. I understand that. They probably believe that even harassment should be considered fair use because, in their opinion, criticism's status as fair use is just as much "codified by Congress" as fair use's status as an equitable rule, as I explained above. From this assumption, it would follow that they would have the right to take a similar attitude towards me as the one I took in ¶ 132 above. But that assumption is dependent on an extremely narrow-minded, extremely self-entitled, and extremely inaccurate interpretation of how fair use actually works. The overwhelming legislative and judicial history of fair use utterly crushes the defendants' beliefs that this is how fair use works "whether Acerthorn likes it or not."

153.    Put simply, criticism is quintessentially transformative, not because "it just is," but because, when done right, it contributes to the cycle of feedback that improves art over time. By contrast, harassment is not transformative, not because "it just isn't," but because it actively sabotages and actively suppresses the science and useful arts through antagonism, aggression, and bullying while offering nothing of value in return, and there is no good public policy reason

for the Court to hold otherwise.

154.    For this reason alone, the Court should hold that the defendants' harassment in this case negates their claim to fair use, even if it declines to take that stance generally.

155.    For all of these reasons and more, I have adequately stated a claim upon which relief can be granted.

## V: LELIEF REQUESTED

156.    In light of this blatant and malicious copyright infringement, I request the following relief:

### V-1: Prospective Injunctive Relief

157.    First, I request that the individual defendant be ordered to cease and desist his distribution of my copyrighted materials.

158.    Next, I request that the corporate defendants be ordered to …

(a)    terminate all of John Doe's google accounts, including all associated Youtube channels, pursuant to 17 USC § 512(j)(1)(A)(ii), and

(b)    to take reasonable steps to ensure that John Doe is never able to create another YouTube account, ever again, pursuant to 17 USC § 512(j)(1)(A)(iii).

159.    I also ask that the Court, pursuant to 17 USC § 503(b), to order the impounding of the Defendants' (all three of them, including the corporate defendants) computers, smartphones, servers, and all other computer-type devices, and have them be wiped clean of any instances of infringement. I ask that the Defendants be made to bear the costs of this impounding and disposition.

### V-2: Statutory Damages

160.    I also request statutory damages in the amount of $450,000. That is $150,000 for each act of infringement. John Doe and Google are jointly liable for the first count of infringement; John Doe and YouTube are jointly liable for the second count of infringement, and John Doe alone is solely liable for the third count of infringement.

### V-3: Other Relief

161.    I also ask for any other relief, legal or equitable, that the Court feels I am entitled to.

## VI: CONCLUSION

162.    Wherefore, premises considered, I respectfully pray that judgment in my favor be granted, costs incurred be awarded, and any other relief to which I may be entitled.

So requested on this, the 17th day of July, 2023.

*/s/ David Stebbins*
David Stebbins (pro se)